bBYRNES, Judge.
Plaintiff-appellant, The Times-Picayune Publishing Corporation, filed a petition requesting a declaration that New Orleans City Code Sections 2-6 (providing for an official journal and an auxiliary official journal) and 2-9 (providing for the establishment of the New Orleans Register) are illegal and void; that any action by the City to implement the provisions of these Code Sections is void; and that a preliminary and permanent injunction issue preventing the City from receiving bids pursuant to its Proposal No. FTC-2946 (a bid package for the official journal of the City) or entering into a contract pursuant to New Orleans City Code Sections 2-6 and 2-9. The Times-Picayune appeals a judgment denying the relief sought in the petition. We affirm.
The Times-Picayune brought this suit to challenge the efforts of the City of New Orleans to enact local requirements for Official Journal publication that it claims significantly dilute mandatory state law minimum standards. The arguments of The Times-Picayune basically break down into two categories: (1) LSA-R.S. 43:141 A does not exempt the parish of Orleans from the standards for an | ^official journal applicable to other parishes; and (2) the standards established by the City aíre not reasonable and violate due process.
I. The City is exempt from the state standards for parish and municipal official journals.
This case turns largely on whether the “parish of Orleans” exemption referred to in LSA-R.S. 43:141 A exempts the City from that part of the Revised Statues entitled “Official Journal of Parishes, Municipalities and School Boards,” LSA-R.S. 43:140 et seq., as is contended by the City, or whether that exemption applies only to the timing of the selection of the official journal by the City as is contended by the Times-Picayune. The trial court adopted the City’s position. LSA-R.S. 43:141 provides:
A. The police juries, city and parish councils, municipal corporations, 1 and school boards in all the parishes, the parish of Orleans excepted, at their first meeting in June of each year, shall select a newspaper as official journal for their respective parishes, towns, or cities for a term of one year. [Emphasis added.]
B. In any parish which is divided by the Mississippi River and has a population of not less than one hundred thousand the governing body shall have the authority to select two official journals for their respective parishes, one which shall be located on one bank of the river and the other which shall be located on the opposite bank thereof and no act heretofore performed shall be considered invalid because of any such parish having heretofore designated two such official journals.
IsThe Times-Picayune does not contend that the state has no authority to make an exception to the state statutes regarding parish and municipal official journals that would allow the parish of Orleans to enact its own reasonable standards for such a journal or journals. The Times-Picayune contends that the LSA-R.S. 43:141 A exception “only excepts the ‘Parish of Orleans’ from the requirement of ‘selecting]’ an Official Journal ‘at their first meeting in June of each year,’ and not from the obligation to select an Official Journal meeting the minimum requirements.” However, the placement of the exception language within the paragraph does not support The Times-Picayune’s position. It is much more logical and consistent with the placement of the exception to conclude that the exception was intended to exclude the “parish of Orleans” from the state statutory scheme concerning official journals. Had the phrase “the parish of Orleans *378 excepted” followed the phrase “at their first meeting in June each year” then we might be persuaded that the exception was intended to apply to the June meeting date. But the phrase “the parish of Orleans excepted” immediately follows the phrase “all the parishes” and by any normal reading and construction must be understood as creating an exception to “all the parishes” rather than creating an exception to the June meeting date.
The main import of LSA-R.S. 43:141 is the establishment of the official journal requirement. The designation of the June meeting date is merely incidental. This conclusion is reinforced by comparison of LSA-R.S. 43:141 with the related next chapter of Title 43 concerning judicial advertisements and legal notices. LSA-R.S. 43:201 commences with the phrases, “All parishes of the state, outside of the parish of Orleans ...,” while Orleans is dealt with separately in the LSA-R.S. 43:202. More significantly, LSA-R.S. 43:202 requires that the | ¿newspaper for judicial and legal notices in Orleans be selected in June. In other words, not only does LSA-R.S. 43:201 creates a clear exception for “the parish of Orleans” as does LSA-R.S. 43:141 A, but LSA-R.S. 43:202, which regulates Orleans separately from the other parishes, specifically requires that the selection of the publication of choice be made in June, dispelling all notion that there is any reason to read the corresponding provision in the preceding chapter of Title 43, LSA-R.S. 43:141 A, in such a way as to limit the effect of the exception applicable to the “parish of Orleans” to the timing of the selection process.
In its brief The Times-Pieayune contends that LSA-R.S. 43:145 “clearly requires the City of New Orleans, a ‘municipal corporation’ [to] ‘select ... ’ a newspaper as its Official Journal.”. However, when LSA-R.S. 43:145 is read in its entirety it leads to a very different conclusion:
Municipal corporations shall select an official journal published in an office physically within their municipal boundaries if a newspaper as defined in R.S. 43:140(3) is published therein. If no qualified newspaper is published within the municipal boundaries, a newspaper published in the parish of the municipal corporation which meets the requirements of a newspaper as defined in R.S. 43:140(3) shall be selected. [Emphasis added.]
We find that LSA-R.S. 43:145 was enacted for the purpose of setting forth the geographic requirements of official journals of other parishes and municipalities, not for the purpose of governing the City’s official journal. Instead, the requirement that there be municipal and parish official journals is set forth in LSA-R.S. 43:141 where the exception for the City is to be found. LSA-R.S. 43:141 is found near the outset of Part I, Chapter 4 of Title 43 entitled “Official Journal of Parishes, Municipalities and School Boards,” immediately following the [.¡“Definitions”[1] in LSA-R.S. 43:140. Had LSA-R.S. 43:145 been intended to be the section in Part I, Chapter 4 of Title 43 designed to establish the requirement that parishes and municipalities have official journals, which is, after all, the designated purpose of that Part of the statutes, one would normally expect that basic purpose to be expressed at the outset, leaving the ensuing sections to deal with the particulars of the matter. (Similarly, the state official journal is established by LSA-R.S. 43:81 which corresponds to LSA-R.S. 43:141, and eorre- *379 spondingly is found at the beginning of Chapter 2 of Title 43.)
LSA-R.S. 43.T45 was intended to be limited in its applicability to the geographic requirements for official journals. LSA-R.S. 43:145 does not exist in a vacuum. When it is read in the context of the entire Part I, Chapter 4 of Title 43, it becomes obvious that it LSA-R.S. 43:145 must be read in tandem with LSA-R.S. 43:146:
Where there is no newspaper published in an office physically located within the parish which meets the requirements of R.S. 43:140(3), a newspaper in an adjoining parish may be designated as the official journal. [Emphasis added.]
When LSA-R.S. 43:145 is read together with LSA-R.S. 43:146 as intended, it becomes clear that the purpose of LSA-R.S. 43:145 is to set the geographic limits when there is a journal within the municipality (or in the parish when none exists within the municipality), and LSA-R.S. 43:146 allows for the selection of a journal in an adjoining parish when there is no journal within the municipality or parish as prescribed by LSA-R.S. 43:145. Thus, placing LSA-R.S. 43:145 within |fithe proper statutory context reinforces our conclusion that it does not impose state standards for an official journal on the City and was not intended to supercede the exemption for the city found earlier in LSA-R.S. 43:141 A.
The LSA-R.S. 43:141 A exemption of the “parish of Orleans” placed at the outset of the Part on official journals can most logically be read as applying to the entire Part, and does indeed, to use the language of the plaintiff, “trump” the ensuing provisions of the statutes. LSA-R.S. 43:141 A creates an exception to, but not a conflict with, the ensuing provisions.
In its reply brief The Times-Pieayune contends that the historical context of official journal regulation by the state demonstrates that “the State has had uniform official publication standards in place continuously since the mid-19th century.” We agree with the Times-Picayune that the historical context of this issue is informative, but our review of the history causes us to disagree with The Times-Picayune’s conclusion. A progenitor of LSA-R.S. 43:141 A is to be found in Act 138 of 1894. The preamble of that act makes it clear that the exception for Orleans is not intended to be limited to the meeting date exception, because the preamble excepts the parish of Orleans from the effect of the act but does not mention meeting date:
AN ACT
To authorize and require the police juries of the several parishes in this State, the parish of Orleans excepted, to elect, a parish printer for their respective parishes; empowering them to designate the official journal for their respective parishes ... [Emphasis added.]
The reference to a meeting date does not occur until one gets to the body of the Act where, after the preamble, it is mentioned in a context that shows it to be | ^merely one subject applicable to the other parishes but subordinate to the general exception expressed in the preamble in favor of “the parish of Orleans.”
Act 184, § 22 of 1908 provided:
Be it further enacted, etc., That the police juries and municipal corporation in all parishes, including the Parish of Orleans, shall not hereafter order public printing of any kind, unless the same be done under contract and adjudication to the lowest responsible bidder, under such rules and regulations as they may establish after due public notice ... [Emphasis added.]
The legislature would not have felt it necessary to add the phrase “including the Parish of Orleans” after the all inclusive phrase “all parishes” had not it felt that there was a presumption that Orleans would otherwise be exempt. Moreover, it is interesting to note that Act 184, § 22 of *380 1908 required that public printing in all parishes, including Orleans, be done pursuant to “such rules and regulations as they may establish ...” Thus, Act 184 of 1908 allowed all of the parishes to establish their own rules and regulations for the printing of public notices. From this we infer that the state may have the power to establish uniform publication requirements, but there is no imperative that it do so.
Act 141, § 22 of 1912 provided that:
Be it further enacted, etc., That the Police Juries and Municipal Corporations in all the Parishes, the Parish of Orleans excepted, at their first meeting on or after the first day of August, 1912, and annually thereafter at their first meeting in July ... [Emphasis added.]
Act 156, § 2 of 1940 also provides an exception for the parish of Orleans. We conclude that there is no historical support for the Times-Picayune’s position. For over one hundred years the State has recognized the parish of Orleans as a special case. Even in Act 184, § 22 of 1908 where the parish of Orleans was | sincluded under the same rules as were applicable to all other parishes,. the inclusion of Orleans was done by specific reference, setting it apart from all. other parishes in that regard.
Yoes v. St Charles Parish Council, 400 So.2d 260 (La.App. 4 Cir.1981), writ den. 409 So.2d 618 (La.1981), does not support the Times-Picayune’s argument that the City Home Rule Charter provisions regarding the Official Journal are violative of the state’s police powers as expressed in LSA-R.S. 43:140, et seq. Yoes dealt with St. Charles Parish. There is no exception to be found in LSA-R.S. 43:140, et seq. regarding St. Charles Parish comparable to that afforded the parish of Orleans in LSA-R.S. 43:141 A. Therefore, Yoes is legally distinguishable.
Our reading of LSA-R.S. 43:141 A is that the City is exempt from the state regulatory scheme for official journals and that the City is free under its Home Rule Charter to set up its own reasonable and rationally based standards for such a journal. There is no evidence in the record that the City is not competent to do so.
We conclude that the City is exempt from the requirements of LSA-R.S. 43:140, et seq.
II. The City ordinances are reasonable and do not violate due process standards.
Haying concluded that the City is exempt from the effects of LSA-R.S. 43:140, et seq., we will now proceed to examine the reasonableness of what the City proposes to do, as measured by due process standards.
The Times-Pieayune cites several constitutional and statutory provisions referring to official journals: La. Const. Art. III, § 13; Art. XIV, §§ 24.8 & 24.9; LSA-R.S. 33:4065.3; 33:44084-85; 33:4096; 33:4121; 33:4128; 33:4141; 33:4151; |fl35:330; and 35:338. From these provisions the Times-Picayune infers that the City must have an official journal, and that the journal must conform to the provisions of LSA-R.S. 43:140, et seq. But the City has not attempted to dispense with the requirement of having an official journal. The City argues that it has an official journal; that it has established reasonable standards for that journal; and that it is exempt from the requirements for official journals set forth in LSA-R.S. 43:140, et seq. Under the City’s Home Rule Charter the City has the authority to regulate its Official Journal:
Section 3-122. Official Journal.
(1) The Clerk of Council shall annually offer a contract for the publication of the official journal of the City to be awarded to the lowest competitive bidder meeting the specifications contained in the bid documents. The requirements for the official journal shall be established by ordinance.
*381 (2) The ordinance establishing requirements shall also stipulate that the official journal will accept for publication, at not more than the same rates, the official publications of the various officers, departments and boards of the City.
(3) Unless prohibited by applicable and preemptive state law, the Council may provide by ordinance that any item required by this Charter to be published in the official journal may instead be published electronically or in a register. The Chief Administrative Officer shall be responsible for implementation of said ordinance. Any contract for such publication shall be subject to applicable public bid laws and competitive selection procedures.
Section 3-123. Publication of Ordinances and Official Acts.
(1) All ordinances and other official acts of the Council shall be published promptly after their adoption by one insertion in the official journal, except as otherwise provided by applicable state or municipal law or this Charter.
(2) The Council may provide for or require the publication in |inthe official journal of all or any part of the proceedings, notices, and actions of officers, departments and boards of the City.
The Times-Picayune contends that because notices printed in the City’s official journal may affect citizens living outside of the parish, the City does not have the authority to set its own reasonable standards for an official journal. The Times-Picayune implies that by following the state standards to the letter, the journal will somehow directly reach and inform everyone with an interest in the matters published, no matter where they are located throughout the state. The Times-Picayune refers to citizens “of Louisiana, but not of New Orleans [who] have an interest in the notices published regarding their property - an interest which is protected by the State statutory scheme.” But there are also certainly citizens of the United States residing outside of this state who may also have an interest in matters that may be the subject of the official journal. They, too, have certain due process rights. In effect, The Times-Picayune argues that the statutory scheme found in LSA-R.S. 43:140, et seq., was intended to provide distribution beyond the parish of primary publication. But there are no distribution requirements anywhere in LSA-R.S. 43:140 et seq. There are not even any minimum circulation requirements. The only concern regarding the manner of publication to be found among the statutes at issue are those rather parochial provisions dictating where each parish’s official journal is to be published while expressing no concern whatsoever regarding distribution, circulation or frequency of publication. The Tlmes-Picayune’s argument that the state statutory scheme for the parishes generally was intended to set certain official journal standards for distribution and circulation is without support in LSA-R.S. 43:140 et seq.
11 Moreover, in many cases where there is a possibility of the deprivation of property raising due process concerns, there is a specific statutory provision applicable to the City governing publication. LSA-R.S. 43:202.
LSA-R.S. 43:81 creating the requirement for the state’s official journal requires publication only in the city of Baton Rouge and a paid circulation of only ten thousand. Surely the official actions of the state as a whole may be presumed to affect a wider geographic range and a greater number of citizens than the official actions of the City of New Orleans. Yet LSA-R.S. 43:81 does not require that the official journal of the state be published outside the city of Baton Rouge, and its publication within Baton Rouge need not exceed ten thousand. Therefore, it does not appear that the concept of official journal was devised with the expectation of actually reaching directly all those who may *382 have some interest in the matters required to be published in the journal without some affirmative action on the part of the interested person to obtain a copy. The statute provides only for reasonable access or availability of the publication.
•The Times-Picayune cites' Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950), in support of the implication that notice as prescribed by the City would be violative of due process whereas notice pursuant to state standards would not. But as was noted in Parkview Oak Subdivision Corp. v. Tridico, 95-0604, p. 3 (La.App. 1 Cir. 11/9/95); 667 So.2d 1101, 1103, writ den. 96-0622 (La.5/10/96); 672 So.2d 921:
The court in Mennonite [Board of Missions v. Adams], 462 U.S. at 795, 103 S.Ct. at 2709, citing, its previous decision in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), recognized that “prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a Instate must provide ‘notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.’ ” The court explained that “[njotice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well-versed in commercial practice, if its name and address are reasonably ascertainable.” Id. 462 U.S. at 800, 103 S.Ct. at 2712. [Emphasis added.]
Mullane and Mennonite do not stand for the proposition that the state law requirements found in LSA-R.S. 43:140, et. seq., are superior for due process purposes to those confected by the City. Those cases turn on the question of whether, under the particular facts of each case, a public notice is adequate where a more direct and particular alternative is available, for example, notice mailed to the last known address of the affected party. Significantly, in those instances where the Mennonite standards for due process require actual notice, the uniform state standards set forth in LSA-R.S. 43:140, et seq., are no more adequate than the publication procedures adopted by the City. As to those matters not requiring actual notice, e.g., the enactment of ordinances affecting the public generally, we find that for the reasons set forth hereafter in greater detail, the City publication requirements are no less reasonable than those the State requires of other parishes. We can think of no approach to publishing an official journal that will directly and automatically reach everyone potentially affected by the subject matter contained in the journal. Accordingly, we conclude that there is no merit to The Times-Picayune’s due process arguments.
We will now proceed to The Times-Picayune’s interrelated arguments concerning the reasonableness of the City ordinances. We agree with The Times-Picayune that a requirement that the official journal be available by paid | ^subscription, at least as an alternative means of availability, offers' the advantage of insuring ease and certainty of availability for those who wish to subscribe. The Times-Picayune points out that publications distributed at no cost may have.uncertain availability and distribution. For example, one individual could theoretically help himself to dozens of free copies, thereby depriving other interested parties of a chance to obtain a copy. On the other hand, in a City where there is significant poverty, there is something to be said for a free journal. One might argue that the City could improve its ordinances by adding the requirement that its Official Journal be available by paid subscription. However, it is not the function of this Court to design and enact legislation. As long as City ordinances deal with matters within *383 the purview of City authority in a reasonable and rational way, which we find that they do in the case before us, we are not here to impose our perception of better legislation.
LSA-R.S. 43:142 requires a paid circulation for other parish journals, but sets no minimum circulation requirement. The City does not require a paid circulation, but it does require a minimum circulation of 10,000. We fail to see how the City’s circulation requirement is any less rational than that of LSA-R.S. 43:142. We find no inadequacies in the City standards in this regard when compared to those that apply to other parishes and municipalities.
LSA-R.S. 43:142 requires that parish and municipal official journals have a five-year history of publication. The City requires only two years as does LSA-R.S. 43:81 relating to the state journal. The Times-Picayune contends that the five-year requirement helps insulate the publication from political retribution for publishing unflattering articles concerning those with political power to influence |uthe awarding of the contract to print official notices, i.e., the five-year requirement represents a freedom of the press protection.
The Times-Picayune argues that the basis for the five years is that it exceeds the four year term of many political offices, making it difficult for such politicians to engage in political retribution by awarding the official journal contract to a publication newly formed for the express purpose of providing favorable press coverage. On the other hand, the five-year history of publication requirement may have as much to do with the political process as The Times-Picayune argues the City’s two-year requirement might permit, as one could argue that the five-year requirement was enacted to favor vested interests. LSA-R.S.- 43:81 requires that the official journal of the state have only a two-year history of publication. State legislators are elected for four-year terms just as are members of the City Council, yet the statute relating- to the official journal for the state contains a two year requirement. There is no evidence in the record that would support a finding that the City acted in bad faith in establishing its official journal requirements. Nor is there any evidence in the record that the City will exercise bad faith in the implementation of those requirements. We cannot say that the City’s two year requirement is unreasonable, especially when compared to the two-year standard for the state journal found in LSA-R.S. 43:81.
The City argues that it has an interest in opening up the official journal process to competitive bidding and that what the Times-Picayune is really arguing for is the maintenance of standards that, in effect, give it monopoly status. We agree public bidding is generally considered to be in the public interest; however, press freedom and due process are considered even more essential and fundamental to our system of democracy.
|1fiBut there is no presumption and no evidence in the record that the City will implement its official journal policies in any more or less political a manner than was involved in the drafting of the state statutes regulating official journals in other parishes. For example, the LSA-R.S. 43:142 requirement that parish official journals be published “in an office physically located in the parish” does not seem to have any particular bearing on a journal’s circulation and effectiveness for purposes of notifying the public of official matters.
The Times-Picayune argues for the uniform application of state standards as the most effective means of disseminating public notices, but there are no state requirements directly affecting the effectiveness of publication. To the contrary, the state requirement that the municipal journal have an office physically located in the municipality ignores the fact that a large urban newspaper nearby may have a greater circulation in a small neighboring *384 suburban municipality than a journal with an office physically located within the smaller municipality.
LSA-R.S. 43:81 imposes no advertising requirements on the state official journal. LSA-R.S. 43:140(3) requires that municipal and parish official journals have a five year track record of not being published primarily for advertising purposes and that they contain not more than 75% advertising in more than one-half of their issues. The City requires that its Official Journal not contain more than 75% advertising in over one-half of the issues in the preceding year. Moreover, the City imposes the additional requirement that the publication’s news and information not be primarily about advertisers. The state journal and other parish journals do not specifically have to meet this test. When compared to both the state journal and other parish journal requirements, we cannot say that the City requirements are irrational or unreasonable.
|1fiThe City requires that the publication not, be owned or published as an auxiliary to a non-publishing business. The state and other parish journals do not have to meet this test. The City requirements are not deficient when compared to those of the state and other parish and municipal journals.
The state official journal must possess a second class mailing permit, but it is not required to have had it for any specified time period prior to qualification. LSA-R.S. 43:81. Parish journals must “have been entered in a U.S. post office in that parish under a periodical permit in that parish for a period of five consecutive years prior to the selection.” ' LSA-R.S. 43:142. The City requires a “periodicals or bulk class mailing permit at the United States Post Office located within the city.” New Orleans City Code Section 2 — 6(a)(2). The City requirement is reasonable where there is no time requirement at all for the state journal.
The Times-Picayune notes that LSA-R.S. 43:140(3)(b) requires parish journals to include “regular news coverage of local public meetings and events,” but the City has no such requirement. We note that the state journal has no analogous requirement. LSA-R.S. 43:81. Therefore, we cannot say that this is a sufficient basis to find that the City’s requirement is inadequate, irrational or unreasonable.
The Times-Picayune complains that the City intends to publish its adopted actions in the New Orleans Register in lieu of publication in the Official Journal, in contravention of LSA-R.S. 43:143 requiring publication in an “Official Journal.” As noted previously, because of the exception created for Orleans Parish in LSA-R.S. 43:141 A, we find that LSA-R.S. 43:143 does not apply to Orleans Parish. The Times-Picayune contends that: “[T]o the extent that the City intends to publish any public notice solely in the New Orleans Register, where publication in [17the Official Journal is required by statute, such action - expressly violates State law and, therefore, cannot be ‘consistent’ with it.” We are not yet faced with any such attempt to publish by the City. We are not ruling out the possibility that there may be a statute, to which the City may be subject, requiring publication in an Official Journal, that is written in such specific terms as to preclude the use of the New Orleans Register. City Charter Section 3-122, Official Journal, provides for publication in a register, “[ujnless prohibited by applicable and preemptive state law.” However, the presence of such a provision in the Charter must at least create a presumption that the City intends to abide by it. Moreover, City Code § 2-9 providing for the New Orleans Register requires that it be available by paid annual subscription, by single issue purchase, and by placing a copy as reference material in all branches of the New Orleans Public Library. In the absence of any evidence to the contrary, we must assume that any *385 attempt by the City to implement the use of the New Orleans Register will be in conformity with the limitation quoted above from the City Charter. We note that such a limitation would govern even if not expressly set forth in the City Charter. We can find no merit to The Times-Picayune arguments concerning the New Orleans Register.
Finally, the Times-Picayune asserts that the City ordinances are inconsistent with the Home Rule Charter’s prohibition against awarding the Journal contract to a joint venture and also the Home Rule Charter requirement that the contract be awarded to the lowest bidder.
The Times-Picayune’s position regarding joint venture journals is based on the argument that the use of the words “the” and “a” throughout the Home Rule Charter in reference to the Official Journal precludes the employment of a joint venture. The Times-Picayune fails to explain how the employment of a joint venture journal could Impossibly have an adverse impact on the public. On the other hand, where a joint venture is involved, each publication must meet all of the requirements that a single publication would have to meet. Thus, the public would have the advantage of being able to chose between two publications, each of which would have a circulation of at least 10,000 and each containing the same notices. Home Rule Charter Section 3-122, Official Journal, states, “The requirements for the official journal shall be established by ordinance.” We find that this language is broad enough to allow the City to define the requirements by ordinance to include a joint venture.
The Times-Picayune contends that the City’s, provisions may violate the requirement that the Journal bid be awarded to the lowest bidder, based on the following argument:
[T]he bid specifications call for combined bids to be received for Official Journal notices and display notices. According to the specification, the display notice component of the bid will be over 97 percent of the dollar value of the bid. As a result, the Official Journal contract may well be awarded to a bidder that does not furnish “the lowest competitive bid” for Official Journal notices, which is contrary to the express language of the Home Rule Charter.
The Times-Picayune is correct that publication of the Official Journal cannot be combined with display notices in such a way that the publishing of material subject to Official Journal publication requirements is not awarded to the lowest Official Journal publication bidder as required by Home Rule Charter Section 3-122(1). However, that has not yet occurred and there is no evidence in the record that the City would attempt to do so. Accordingly, we find no merit in this argument made.
Conclusion and Decrfee
11 ¡(Until such time as it is demonstrated that political forces are subverting the freedom of the press, we must exercise that judicial restraint necessary to effectuate our system of separation of powers by refraining from trespassing on the domain of the legislative powers exercised by the State in exempting the City, and by the City in implementing that exemption through the reasonable exercise of its Home Rule powers.
The City ordinances do not violate due process standards and after comparing the City’s Official Journal regulations to those of the state and other parishes, we find nothing that would permit us to find that the City was unreasonable or that it has exceeded its legislative authority.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. We note that historically LSA-R.S. 43:141 was the first section Chapter 4 of Title 43 concerning officials journals of parishes and municipalities, etc., and that LSA-R.S. 43:140 ''Definitions” was not added until Act 378 of 1986 was enacted. This historical placement at the very beginning of Chapter 4 antedating by many years the creation of LSA-R.S. 43:140, .serves to reinforce the logic of the City’s contention that LSA-R.S. 43:141 and its exception for the ''parish of Orleans” was meant to apply to the ensuing provisions of Part I, Chapter 4.