|, ARMSTRONG, Chief Judge.
The defendant-appellant, Public Belt Railroad (hereinafter “Public Belt”), appeals a judge trial personal injury judgment in favor of the plaintiff-appellee, Vernon Cooper. The judgment awarded Mr. Cooper $2,500,000.00 in general damages, $22,000.00 for lost earnings, $292,646.00 for loss of earning capacity, and! $94,000.00 for past medical expenses, subject to a finding of 35% comparative negligence on the part of the plaintiff, thereby reducing the award to a total of $1,843,400.00. The plaintiff answered the appeal asking that the general damage award be increased.
Plaintiff suffered injuries resulting in the amputation of his left leg and other physical damages when he was struck by a Public Belt Railroad train at approximately 12:00 a.m. on May 23, 1998, near the Moonwalk -in the French Quarter, not far from St. Peter Street. Therefore, while the parties may dispute particular details concerning the quantification of his damages, it is indisputable that the plaintiff *534 was the victim of a tragic accident causing him terrible injuries.
According to his own testimony, the plaintiff had started off his day on the previous morning at approximately 10:30 a.m., sharing two six-packs of beer with three other friends and smoking marijuana cigarettes laced with cocaine. His | ^friends left at around 12:30 p.m. The plaintiff also consumed a half of a pint of mint gin.
At around 3 or 4 p.m., his girlfriend “started fussing” so the plaintiff left the house at around 6 or 7 p.m. and went to the Moonwalk in the French Quarter. On the way he purchased two 16-ounce Bud-weisers and a big bag of popcorn. On cross-examination he admitted to drinking eight 16-ounce Budweisers over the course of the day. He also admitted to previous guilty pleas to possession of marijuana and possession of crack cocaine.
Plaintiffs expert, Dr. William George, Ph.D., testified that two and a half hours after the accident the plaintiffs blood alcohol level was .256, dramatically over the legal limit. He characterized this blood alcohol level as “grossly intoxicated.” He further testified that the plaintiff tested positive for marijuana and cocaine metabolites in his system. When asked whether the use of these other two drugs reacts with alcohol in such a way as to produce a stronger effect, he responded, “Yes.”
Dr. George also testified that at a blood alcohol level of only .15 plaintiff would have experienced significant impairment of motor coordination. At a blood alcohol level of only .05 “there is a 25 percent increase in reaction time across the board.” Dr. George then testified that at a blood alcohol level of .11 reaction times are doubled. To put this in perspective Dr. George testified that:
For example, with a blood alcohol level of 100-milligram percent [1], you’re five or six times more likely to be involved in a fatal automobile accident as a driver. At a level of 150-milligram percent [.15], you’re 25 or 32 times more likely to be involved in a fatal automobile accident. At 200-milligram percent [.2], you’re 40 to 50 times more likely to be involved in a fatal automobile accident.
|aThe record compels us to agree with the Public Belt’s contention that if, as the trial court concluded, subsequent to approximately 10:30 a.m., “Mr. Cooper had no other drugs or alcohol for the remainder of the morning and afternoon,” then Mr. Cooper’s testimony that he only had two beers between 6:00 p.m. or 7:00 p.m. and midnight is unbelievable. Dr. George testified that:
[A] six-pack of Budweiser beer consumed over an hour or two would have impacted reaction time, I’ll tell you that a six-pack of Budweiser over an hour or two would produce a blood alcohol level [in a man of plaintiffs weight] to maybe around 90[.09], a hundred milligram percent [.1],
Regardless of whether we take Dr. George’s low end estimate of .09 or his high end estimate of .1, we are still at less than 40% of the blood alcohol level Mr. Cooper was shown to have had two and one-half hours after the accident, which is also over fifteen hours after the trial court found that the plaintiff had stopped drinking in the morning. It is, therefore, virtually impossible for the plaintiff to have attained the blood alcohol level he was shown to have had at 2:49 a.m. on the morning of the accident, approximately two and one-half hours after the accident, if all he had to drink over the fifteen hour period immediately prior to the accident were the two beers he testified to purchasing on his way to the Moonwalk. The paramedic who attended the plaintiff at *535 the accident scene testified that, “the smell of alcohol was just overwhelming.” Therefore, we are compelled to find that the plaintiffs testimony on the question of when and how much he drank is so contradicted by objective evidence as to be unworthy of belief and that consequently the findings of the trial court must be manifestly erroneous in this regard.
|4Mr. Cooper admitted visiting the Moonwalk “hundreds” of times — at least two or three times a week during a four or five year period prior to the accident. He knew that trains regularly passed through the Moonwalk. He also admitted that from the park benches he could hear the loud rumbling of the train as it passed by regardless of whether a horn was blown.
The record reveals that on the day of the accident Mr. Cooper, as was his custom, failed to take the properly designated and signaled grade pedestrian crossing and instead took an unauthorized shortcut via a route through a parking lot, across street car and railroad tracks and past a chain and bollard divider going up the slope of the rise to the Moonwalk. There he listened to music on his radio headphones and to musicians playing saxophones and trumpets on nearby benches. When he decided to leave the Moonwalk, he returned by the same route by which he had come. As he neared the Public Belt right of way, his field of vision was unobstructed, but he saw nothing. While on previous occasions he had been able to hear approaching trains regardless of whether a horn was blown, on the night of the accident he saw nothing, he heard nothing, and did not feel the vibrations of the slowly approaching train.
Two mounted policemen, Officers Parker and Schneider, patrolling the Moonwalk parking lot that night, testified in deposition that they heard the train and saw it approaching. Officer Parker was “pretty sure” he recalled seeing the train light. Officer Parker testified that although the train was still over a block away from the St. Peter Street crossing when the officers first noticed it, they heard the horn “constantly blowing. You could hear it for a ways.” Officer Parker further testified that a few minutes after the train passed, the officers, who had not yet passed St. Peter Street, heard a lady yelling behind them. They turned back | ¡¡downriver to investigate. About 50 feet downriver from where the train had passed the officers, midway between St. Peter Street and St. Ann Street (the streets bounding Jackson Square on the east and west), they saw the plaintiff, Vernon Cooper, lying on his back — his leg had been severed. He still had his headphones on his head, and he appeared to be intoxicated.
At trial, all Cooper was able to say was that as he approached the track he caught a “glimpse” of the train out of the corner of his eye and tried to jump back — he remembered nothing further.
Harbor Police Officer, Michael J. Moli-nari, investigated the accident. He testified that if Ms. Pucciarelli had told him that she had actually seen the impact, he would have noted that fact in his report. He then testified that there was no such note in his report. He further testified that Ms. Pucciarelli did not indicate to him that she had seen Mr. Cooper being hit by the train. Officer Molinary was asked:
Q. Miss Pucciarelli indicated to you, did she not, that she saw Mr. Cooper running in an attempt to beat the train?
A. Yes sir.
Q. Miss Pucciarelli also indicated that Mr. Cooper was wearing headphones and appeared to have been drinking, correct?
MR. WEISS [Plaintiffs counsel]:
*536 Objection. I’ll withdraw the objection. I’m sorry.
THE WITNESS:
Yes, sir. She stated that.
In due course, Mr. Cooper filed a timely suit against the Public Belt, the owner of the parking area, Park One, and the operator of the Moonwalk, the Audubon Institute. Park One and the Audubon Institute were dismissed when this Court reversed on writs the trial court’s refusal to grant them summary judgment.
The plaintiff contends that the Public Belt is not a “political subdivision” as that term is defined in La. R.S. 13:5102 B:
[r,As the term is used in this Part, “political subdivision” means any parish, municipality, special district, school board, sheriff, public board, institution, department, commission, district, corporation, agency, authority, or an agency or subdivision of any of these, and other public or governmental body of any kind which is not a state agency. [Emphasis added.]
This first became an issue preliminarily when the Public Belt moved to have the plaintiffs jury demand stricken pursuant to La. R.S. 13:5105, which denies plaintiffs the right to a jury trial in suits against political subdivisions (as defined above) of the state of Louisiana. By ruling in favor of the Public Belt on this issue, the trial court found by necessary implication that the Public Belt was a political subdivision under La. R.S. 13:5102 B.
The next time the status of the Public Belt under La. R.S. 13:5102 B becomes an issue is in connection with Public Belt’s argument that the amount of the judgment against it exceeds the $500,000.00 limitation established in La. R.S. 13:5106 B(l). La. R.S. 13:5106 B(l) sets a $500,000.00 limit on personal injury awards, “exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings ...” La. R.S. 13:5106 B(l) applies to the state, state agencies and political subdivisions as defined by La. R.S. 13:5102 B.
The Public Belt contends that this definition is more than broad enough to include itself. The plaintiff counters that the Public Belt is not a state agency or political subdivision, but a commission of the City of New Orleans, citing Ford v. New Orleans Sewerage and Water Board, 594 So.2d 1088 (La.App. 4 Cir.1992), i.e., the plaintiff argues that La. R.S. 13:5102 B only applies to state agencies and not to municipal governmental entities.
In Ford the issue was whether an employee of the New Orleans Sewerage and Water Board should also be considered to be an employee of the City of New 170rleans for purposes of worker’s compensation benefits, such that an employee of the City could not sue for the negligence of an employee of the Sewerage and Water Board. This Court considered the question of whether the Sewerage and Water Board was a State agency or part of the City government. This Court held in Ford that the Sewerage and Water Board was an integral part of and included in the City of New Orleans, and as such an employee of the Sewerage and Water Board should be treated like an employee of the City for purposes of worker’s compensation benefits. While Ford dealt with the New Orleans Sewerage and Water Board, we agree with the plaintiff that for all purposes relevant to the instant case, the governmental status of the Sewerage and Water Board in Ford is analogous to the status of the Public Belt in the instant case. This Court noted in Ford that both the Sewerage and Water Board and the Public Belt were classified in the same section of the City Charter as “Unattached” “Boards and Commissions.”
*537 However, we note that Ford was explicitly overruled some years later by Roberts v. Sewerage and Water Bd. of New Orleans, 92-2048 (La.3/21/94), 634 So.2d 341, 351, but not in such a way as to alter the conclusion of this Court. The Supreme Court in Roberts found that, like parent and subsidiary corporations, the employees of the City and the employees of the Sewerage and Water Board were employed by separate entities for purposes of workers’ compensation and overruled Ford on that basis. However, the Roberts court referred to the Sewerage and Water Board as a “local government unit”[1] consistent with the board definition of “political subdivision” found in La. R.S. 13:5106 B(l). There is nothing in Roberts implying that this Court’s view of the Public Belt and the Sewerage and 18Water Board as similar “unattached” “boards and commissions” was in any way erroneous. We infer from the reference in Roberts to the fact that the Sewerage and Water Board was a local governmental unit that the Supreme Court would likewise consider the Public Belt to be a local government unit consistent with the broad definition of “political subdivision” found in La. R.S. 13:5106 B(l), either a “municipality” or “an agency or subdivision” thereof, or “other public or governmental body of any kind.”
That portion of the testimony of John Morrow quoted by the plaintiff in his brief only serves to reinforce this conclusion:
Public Belt is a city agency, just like the Sewerage and Water Board is. Like the Sewerage and Water Board has 16 commissioners. We’re exactly that. We are a city publicly owned railroad.
Accordingly, we find that the language of La. R.S. 13:5102 B, e.g., “municipality” or “an agency or subdivision” thereof, or “other public or governmental body of any kind,” is broad enough to include a city commission such as the Public Belt. This is consistent with the public policy considerations expressed in La. R.S. 13:5106 E:
E. The legislature finds and states:
(1) That judgments against public entities have exceeded ability to pay on current basis.
(2) That the public fisc is threatened by these judgments to the extent that the general health, safety, and welfare of the citizenry may be threatened.
(3) That the limitations set forth in this Section are needed to curb the trend of governmental liability abuses, to balance an individual’s 19claim against the needs of the public interests and the common good of the whole society, and to avoid overburdening Louisiana’s economy and its taxpaying citizens with even more new and/or increased taxes than are already needed for essential programs.
(4) That the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the constitution.
Thus, La. R.S. 13:5106 E explains that the rationale for applying the limitation to municipal entities such as the Public Belt is to benefit the public by preventing judgments from impairing the functions of public entities. It is clear that the legislature in the expansive language of La. R.S. 13:5102 B intended to extend the protections to municipalities and municipal enti *538 ties as the rationale expressed in 13:5106 E is as applicable to municipalities and their creatures as it is to the state and its creatures. Further, the conclusion reached by this Court as to the municipal status of the Public Belt is consistent with the plaintiffs argument in brief that, “[u]n-der the terms of the Charter, the Board was blanketed into the New Orleans City government ...”
Accordingly, we find that the $500,000.00 limitation or “cap” found in La. R.S. 13:5106 B is applicable to plaintiffs claim.
Next we must determine whether the La. R.S. 13:5106 B $500,000.00 personal injury damage limitation applies to plaintiffs loss of future earnings capacity.
ImPublic Belt does not dispute the fact that under La. R.S. 13:5106 B(2), loss of future earnings is not limited by the $500,000.00 cap. Public Belt contends that it was error for the trial court to award anything for the loss of future earnings capacity. Public Belt argues that the specifically denominated exclusions set forth in La. R.S. 51:5106 B(l) are the only exclusions from the personal injury cap, and “loss of earning capacity” is not included among those specifically denominated exclusions. This argument is based on the assertion by Public Belt that “loss of future earnings”, one of the specifically listed exceptions to the cap, is different from “future loss of earning capacity” and, therefore, is not encompassed by the statutory exclusion of “loss of future earnings.” La. R.S. 13:5106 D(2) defines “loss of future earnings” as “any form of economic loss which the claimant will[2] sustain after the trial as a result of the injury or death which forms the basis of the claim.” We must decide whether it was the intention of the legislature to include “future loss of earning capacity” within the category of “loss of future earnings” in spite of its silence on this issue, or whether the silence on the question of “future loss of earning capacity” expressed the intention of the legislature to exclude it from the list of recoverable items.
There are no cases bearing directly on this issue. The Public Belt argues that “loss of future earnings capacity” is not an “economic loss” as that term is used in La. R.S. 13:5106 D(2). The Public Belt presents the following persuasive argument in support of this contention:
[Ljoss of earning capacity is not an economic loss that the plaintiff will sustain because it is neither an expense that the plaintiff will have to incur in the future, nor is it an income item that the plaintiff would otherwise have received in the future. Plaintiff may argue that because hdoss of earning capacity is measured in dollars it is an economic loss. However, if this were the meaning of “economic loss” in La. R.S. 13:5106(D)(2) the statute would lose its meaning, since many other types of damages such as pain and suffering, permanent disability, and like items are also measured in dollars — items that are clearly subject to the $500,000 cap.... To allow such a loose definition would render the plain language of the cap meaningless.
In awarding “loss of future earning capacity”, the trial court adopted the jurisprudential definition, which distinguishes “loss of future earning capacity” from loss of future earnings:
Loss of Earning Capacity refers to a person’s potential and [sic] not necessarily determined by actual loss. Damages are estimated on th[e] injured person’s ability to earn money rather than what he actually earned before his injuries. Those damages are to be assessed for *539 the deprivation of what the injured plaintiff could have earned despite the fact that he may never had [sic] seen fit to take advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Crowther v. K-Mart Corp., 568 So.2d 669 (La.App. 4th Cir.1990). [Emphasis original.]
A careful examination of the cases relied upon by the trial court supports the Public Belt’s position. In Folse the Supreme Court found error in the appellate court’s reliance “altogether on the pecuniary loss, without considering the contention that there was also a loss of earning capacity...” Therefore, the Supreme Court in Folse draws a distinction between a “pecuniary loss” and “loss of earning capacity.” We find that the term “pecuniary loss” as used in Folse by the Supreme Court is synonymous with “economic loss” as employed in La. R.S. 13:5106 D(2). The Folse opinion goes on to explain the rationale behind the concept of loss of future earning capacity as opposed to loss of future earnings:
The theory is that the injury done him has deprived him of a capacity he would have been entitled to- enjoy even | ^though he never profited from it monetarily. [Emphasis added.]
Id., 371 So.2d at 1123. By noting that proof of loss of future earning capacity does not require proof of future monetary loss, the Folse opinion reinforces the conclusion of this Court that loss of future earning capacity is not an “economic loss” within the intendment of La. R.S. 13:5106 D(2).
The other case relied upon by the trial court in support of its definition of “loss of future earning capacity”, Crowther v. K-Mart Corp., supra, quotes the above quoted passage and more from Folse. Therefore, we find that the Crowther opinion is consistent with the conclusion reached by this Court.
Finally, in addition to the establishment of the $500,000.00 limitation subject to the exclusions set forth in La. R.S. 13:5106 B(l), the manner in which those exclusions are specifically referenced again in La. R.S. 13:5106 C(l) emphasizes the legislative consciousness of the specific nature of the enumerated exclusions and concomitantly serves to support the conclusion that the legislature by creating such a specific list did not intend to include items of damage customarily considered separately, such as loss of earning capacity. La. R.S. 13:5106 C(l) provides:
C. If the state or a state agency or political subdivision is held liable for damages for personal injury or wrongful death, the court shall determine:
(1) The amount of damages exclusive of:
(a) Medical care,
(b) Related benefits,
(c) Loss of earnings and/or support, and
(d) Loss of future earnings and/or support;
1 ^Moreover, because the items excluded from the limitation are “exceptions” they should be strictly construed consistent with the general rule of statutory construction that exceptions be strictly construed. Times Picayune Pub. Corp. v. City of New Orleans, (on rehearing), 99-1685, p. 1 (La.App. 4 Cir. 2/23/00), 760 So.2d 375, 386. This is especially true where the strict construction of the exceptions advances the public policy expressed in La. R.S. 13:5106 E of protecting the public health, safety and welfare from the excessive depredations of judgments against public entities. Cf. Government Computer Sales, Inc. v. State Through Div. of Admin., Office of State Purchasing, 95-2262, p. 4 *540 (La.App. 1 Cir. 5/10/96), 673 So.2d 718, 721.
As an aside, we note that because the plaintiff takes the approach of arguing that the Public Belt is not entitled to the benefit of the La. R.S. 13:5106 B $500,000.00 limitation of liability for any purpose, he did not address the specific question of the applicability of the limitation to loss of earning capacity.
Accordingly, it was error for the trial court to award damages for loss of earning capacity to the plaintiff.
In its second assignment of error, Public Belt contends that Federal law is controlling concerning the question of whether the train was speeding.
The trial court found that the train was traveling between eight and ten miles per hour. Plaintiff concedes in brief that the train did not exceed ten miles per hour: “Plaintiff never alleged nor argued that the train was speeding prior to the locomotive striking Mr. Cooper.” Plaintiff does not contest the Public Belt’s contention that the track was a class two track with a speed limit under 49 C.F.R. § 213.9 of twenty-five miles per hour. The Public Belt does not contest the fact that [ 14it has an internal rule imposing a ten mile per hour speed limit in the area where the defendant was injured. While the plaintiff concedes that the train did not exceed specific regulatory and internal policy speed limits, plaintiff contends that the trial court was correct in concluding in the written reasons for judgment that the “train was operating too fast for the conditions presented at the time of the accident.” The trial judge based this conclusion on his findings that:
(1)The engineer and the crew on the train were aware that the area where the plaintiff was struck was a high traffic area for pedestrians, and that they routinely crossed over the tracks instead of crossing at the crosswalks.
(2) The train personnel were aware of the broken chain and bollard fencing and the worn path traveled by pedestrians daily.
(3) The Public Belt’s rules and regulations require that the train proceed with caution within yard limits. The impact in this case occurred within yard limits.
The Public Belt does not contest any of these findings, but does contest the trial court’s conclusion that the train was traveling too fast under the circumstances, arguing that “federal law preempts any state law negligence claims based upon the speed of the train.” We agree. CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).
Speed limits imposed by federal regulation on freight and passenger trains operating along specific types of track preempt any general state negligence law claim that a train, although operating at a speed within federal limits, was | ^negligently proceeding too fast under circumstances. Id.; Cart v. Missouri Pacific R.R. Co., 99-1118 (La.App. 3 Cir. 12/8/99), 752 So.2d 241.
There is a large body of appellate and trial court decisions finding that state law excessive train speed claims are preempted when there is no evidence providing that the train’s speed was in excess of federal regulations. Id., 752 So.2d at 242. The Second Circuit’s opinion in Furlough v. Union Pacific R.R. Co., 33,658 (La.App. 2 Cir. 8/31/00), 766 So.2d 751 provides an excellent insight into the workings of the federal preemption of state attempts to regulate train speeds:
Federal regulation 49 C.F.R. § 213.9(a) sets the maximum allowable operating speeds for all freight and passenger trains for various classes of track on *541 which they travel. The different classes of track are defined by, inter alia, then’ gage, alignment, curvature, surface uniformity and the number of crossties per length of track. See §§ 213.51-213.143; Easterwood, supra. The S. 24th Street crossing is a class three, for which the maximum allowable speed is 40 miles per hour. The train in this case was traveling well within the allowable speed limit set by the federal regulations. In Easterwood, supra, the Supreme Court stated, “the Secretary’s regulations focus in providing appropriate warnings given variations in train speeds” and that such regulations “must be read as not only establishing a. ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.” More specifically, in Easterwood, the Supreme Court first examined the preemptive clause found in the Federal Railroad Safety Act (“FRSA”) which provides that federal regulations preempt those of a state unless the state necessarily adopts more stringent regulations to eliminate a local safety hazard. [Footnote 8 omitted] The Court then recognized that 49 C.F.R. § 213.9 provides the maximum speeds for trains and found that “§ 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings.” Eastenuood, supra. Our reading of Eastenuood, and its progeny, reveals the Supreme Court’s unquestionable intention to hold that any claim in state tort law based on excessive train speed |1(4s displaced, or preempted, by the federal regulations. [Emphasis added.]
Id., pp. 10-11, 766 So.2d at 759-760.
The plaintiff cites no contrary authority. Nor does the plaintiff cite any authority by which we might find that the conditions at the accident site might qualify for what has been described as the “essentially local hazard” or “specific, individual hazard” exception to federal preemption. The Furlough case also provides ah excellent analysis of this issue:
Alternatively, Plaintiffs contend that, even if the federal regulations regarding train speed “cover” their state law claim, since the crossing in question constitutes an “essentially local hazard” [Footnote 10 omitted] or “specific, individual hazard,” the issue of the train crew’s duty to slow or stop to avoid such hazard is not preempted. Easterwood, supra. Specifically, Plaintiffs claim that the combination of hazards at the S. 24th Street crossing which allegedly existed on January 6, 1995 (i.e., obstructed sight line, rough crossing, parallel roadways, inadequate warning devices, inoperative ditch lights and inclement weather), rose to the level of a “specific, individual hazard.” While we acknowledge that the Supreme Court in Eastenuood chose not to address the preemptive effect on claims for “breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard,” we disagree with Plaintiffs that, on January 6, 1995, the S. 24th Street crossing presented the type of hazard contemplated by courts applying that concept. In Western Company of North America, supra[3], .the third circuit examined the concept of “specific, individual hazard.” In finding none to exist in that case, the court explained:
A “specific, individual hazard” cannot be a statewide problem. A “specific, individual hazard” may entail any object that was not contemplated by the *542 federal regulators who promulgated the Federal Railroad Safety Act and its regulations. Examples of such objects include illegally and improperly parked tank cars which obstruct the view of | i7a train engineer who fails to reduce the speed of the train despite the obstructions. Negligence claims which attempt to impose additional regulations on train speed, such as the train should have operated at a slower speed given the conditions posed by the track or the grade crossings, are preempted by the Federal Railroad Safety Act or its regulations.
Id., pp. 12-13, 766 So.2d at 760-761.
While the plaintiff makes no direct reference to either a “specific, individual hazard” or an “essentially local hazard” exception to Federal preemption, he does make the analogous assertion that the Public Belt failed to adhere to its own internal rules requiring that it operate its trains “at reduced speed, according to conditions, prepared to stop short of a train, engine, car switch not properly aligned, derailed or other obstruction or before reaching a stop signal.” [Emphasis added.]
However, we read these rules as requiring the Public Belt to travel at a reduced speed only when necessary to stop short of certain specific types of known obstructions and that these are the same types of specific obstructions referred to immediately above in the quotation from Furlough. The Public Belt rules do not refer to general conditions such as the fact that pedestrians may attempt to cross the track other than at a designated crossing, a condition that might occur any where along the track.
Therefore, based on the foregoing analysis showing that the question of the speed of the train as regards this accident is preempted by Federal regulation, we are compelled to find that the trial court was without authority to conclude that the Public Belt train “was operating to[o] fast for the conditions presented at the time |1Rof the accident,” as long as it was operating within the limits set by Federal regulation and its own internal rules as it uncon-testably was.
There are a number of places in the reasons for judgment in which the trial court refers to the train’s duty to proceed with caution, as well as references to what the trial court found to be the excessive speed of the train. As such references to the train’s speed impermissibly permeate the reasons for judgment upon which the trial judge concluded that the Public Belt was 65% at fault for causing the accident, we find this to constitute manifest error regarding the allocation of fault.
In its third assignment of error, Public Belt contends that the trial court’s findings regarding the train’s horn were clearly wrong as a matter of fact and law.
The trial court notes in its reasons for judgment that the plaintiff argued that:
[T]he defendant should have either had the locomotive traveling in a manner in which the horn was facing the direction of travel or should have had horns facing both directions ...
The Public Belt contends that any question of design and construction, including the placement of the horn at issue in the instant case, is preempted by federal regulation. Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926); Furlough v. Union Pacific R.R. Co., 33,658 (La.App. 2 Cir. 8/31/00), 766 So.2d 751, 762; and United Transp. Union v. Foster, 205 F.3d 851 (5 Cir. (La.) 2000). We agree. Moreover, we agree with the Public Belt’s contention that there is no evidence that the horn did not meet the decibel standard set out in 49 C.F.R. § 229.129.
*543 However, the question of whether the horn met regulatory standards is not the real issue in this case. From the fact that the trial court does not include the placement of the horn among the duties that were material to the accident that | ^occurred, coupled with the immediately above quoted reference to the duty to blow the horn, which duty the trial court finds was breached by the Public Belt, we conclude that the placement of the horn in no way contributed to the trial judge’s allocation of fault to the Public Belt. Instead, it is apparent that at least a portion of the fault allocated to the Public Belt was based on the following finding by the trial court that there was a negligent failure by the Public Belt to sound the horn within the immediate proximity of the accident site:
Mr. Kerry [,the engineer,] testified that as he approached St. Peter, he sounded his horn and stopped sounding it after the locomotive occupied the pedestrian crossing. Plaintiff was struck by the train 300 feet from where Mr. Kerry stopped blowing his horn.
While the Public Belt expresses concern that the trial court was influenced by the deposition testimony of Ms. Ingrid Puc-ciarelli in his finding that the horn was not blown when and where it should have been blown, we find this not to be the case. The trial court specifically stated that it gave no weight to her testimony and a careful reading of the reasons for judgment leads to the inescapable conclusion that the trial court based its finding entirely on the fact that it is undisputed that the last time that the horn was blown was at St. Peter Street, approximately 300 yards in advance of the accident site.
The uncontradicted testimony of Mr. Kerry, the engineer, switchman Michael Gibson, and switch foreman Wade Adams establishes that Kerry blew the horn at vehicular crossings at Canal, Bienville, Conti, Toulouse and finally at St. Peter. The plaintiff does not contest this. The real issue is whether the train had any duty to blow its horn at any point between St. Peter Street and the accident site. The trial court found that the Public Belt had a duty:
li>nTo proceed with caution as it traversed through the Moonwalk area, an area with high pedestrian travel; and also to sound its horn as to warn pedestrians of its approach.
Similarly, the trial court found that:
[E]vidence and testimony was presented at trial that showed that Public Belt had rules and regulations that required all trains to proceed with caution through the area in question and that the train engineer was to sound the horn of the train in areas of pedestrian cross walks or when a pedestrian is seen near the train tracks. [Emphasis added.]
The Public Belt contends, and the plaintiff does not dispute, the fact that regulations do not require the horn to be blown at pedestrian crossings, unless there is a pedestrian in or near the crossing. Otherwise, regulations require only that the horn be sounded at public vehicular crossings. From this the Public Belt concludes that it was error for the trial court to implicitly impose a general duty to blow the horn as the train approached the accident site in the instant case.
This is not, however, how we read the reasons for judgment. Our reading of those reasons indicates that the trial court based its decision on a lack of vigilant lookout by the train crew, i.e., the failure of the crew to see what they could and should have seen, in this case, the plaintiff, Mr. Cooper. Following the reasoning of the trial court to its logical conclusion, had the members of the train crew observed Mr. Cooper as they should have, they *544 should then have blown the horn in closer proximity to him than St. Peter Street, thereby, more probably than not, attracting his attention more effectively than a horn blown at St. Peter Street, thereby, more likely than not, causing Mr. Cooper to step back and avoid the accident.
121 As we find no flaw in this reasoning, we must next determine whether the record will allow the finding of such facts as are necessary to support such reasoning. Essentially, this boils down to an analysis of whether there was any breach of a duty of what the trial court referred to as vigilance on the part of the train crew which leads us to consider Public Belt’s fourth assignment of error.
In its fourth assignment of error, Public Belt argues that the speculation of plaintiffs expert was not an appropriate basis for a finding of no lookout. The trial court in its reasons for judgment noted that:
Testimony was also brought out at trial relating to a blonde lady who also was almost struck by the train. The testimony brought out at trial shows that the crew did see her, as she approached the tracks as the train approached and a friend pulled her away before she was struck. This incident took place near the time and place plaintiff was struck. The testimony at trial also establish that the crew continued to pay attention to this lady even after they passed her. [Emphasis added.]
Implicit in this finding is the further finding that the crew was distracted by this blonde lady causing them to fail to observe Mr. Cooper in front of the train. This is the only explicit finding made by the trial court upon which a finding that the crew failed in its duty of vigilance could be based.
Plaintiffs expert, Mr. Puryear, was asked:
MR. WEISS [COUNSEL FOR PLAINTIFF]:
.... Do you have an opinion as to whether or not there was any distraction in the area in which Mr. Cooper was injured on the night of this accident? MR. HARDIN [COUNSEL FOR PUBLIC BELT]:
Objection. Speculation.
THE COURT:
Overruled. You can answer your opinion. L,THE WITNESS [MR. PURYEAR]: Yes.
THE COURT:
What is your opinion?
THE WITNESS:
My opinion is when the crew approached this blonde lady with the beer and someone trying to get off the track, they were watching them and saw that they got the blonde out of the way, and everybody was looking back to see what was going to happen next. It happens all the time on the railroad.
Mr. Puryear was tendered by the plaintiff as an expert in train handling operations, railroad practices, railroad highway grade crossings, railroad injuries between trains and pedestrians. Public Belt objected. Along with pointing out the fact that Mr. Puryear had only a high school education, Public Belt’s counsel asked Mr. Puryear the following:
Q. Now, you’ve never investigated a pedestrian train injury you told us just a few minutes ago; is that correct?
A. I can’t recall that I did. I was just involved in some when I was in train service.
In spite of Public Belt’s objections, the trial court accepted Mr. Puryear as an expert based on his many years of experience working in the train industry. Al *545 though Mr. Puryear retired from the train industry in 1997 and was now working part time at a golf course, he contended that he kept himself current in railroad matters by attending union meetings.
It is not necessary that we share Public Belt’s skepticism concerning Mr. Puryear qualifications in general, in order to determine that he is not qualified to ^express an opinion on what the train crew may have been looking at the time of the accident. He admitted that he had no facts upon which to base his opinion.
Therefore, as the burden is on the plaintiff to establish a breach of a duty of vigilance on the part of the Public Belt crew, we must look elsewhere in the record to determine whether there is sufficient evidence to allowing a finding that the plaintiff proved by a preponderance of the evidence that the crew failed in its duty of vigilance. We find no such evidence. It is not sufficient to suggest that the only explanation for the failure of the crew to see Mr. Cooper was a lack of vigilance. That would merely be a guise for the application of the doctrine of res ipsa loquitur, and there is .no authority supporting the application of that doctrine under anything like these circumstances:
Res ipsa is a rule of circumstantial evidence which allows a court to infer negligence on the part of the defendant if the facts indicate the defendant’s negligence, more probably than not, caused the injury.
Spott v. Otis Elevator Co., 601 So.2d 1355, 1362 (La.1992).
The Spott opinion then sets forth the criteria which must be met in order to warrant the application of the doctrine:
Res ipsa loquitur, as “a qualification of the general rule that negligence is not to be presumed,” must be sparingly applied. Day v. National U.S. Radiator Corp., 241 La. 288, 128 So.2d 660, 665 (1961). Generally, it obtains when three requirements are met: 1) the circumstances surrounding the accident are so unusual that, in the absence of other pertinent evidence, there is an inference of negligence on the part of the defendant; 2) the defendant had exclusive control over the thing causing the injury; and 3) the circumstances are such that the only reasonable and fair conclusion is that the accident was due to a breach of duty on defendant’s part. Cf. Wilson v. Hibernia Nat. Bank, 517 So.2d 1206, 1208 (La.App. 4th Cir.1987), writ denied, 520 So.2d 425 ([La.]1988) (in which res ipsa loquitur was not applied), citing Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972), on rehearing.
Id., 601 So.2d at 1362.
l?4In the instant case the third criterion is not met because, in view of the extreme nature of the plaintiffs inebriation, it is just as likely, if not more likely, that the plaintiff was the sole cause of his own injuries rather than that he was the victim of any breach of duty on the part of the Public Belt.
Mr. Puryear testified that it would have been a violation of the train crew’s duty of vigilance had the train been traveling at a rate of ten miles per hour, but we have already concluded in section “HI” of this opinion that federal law preempts this issue and the plaintiff conceded in boldface type in his brief that: “The Speed of the train was not the Basis of PBR’s Liability.”
Mr. Puryear also testified that in his opinion the train crew “were not keeping a vigilant lookout in the direction of travel or they would have seen Mr. Cooper.” There is nothing in Mr. Puryear’s expertise that qualifies him to express an *546 opinion regarding what the train crew was looking at the time of the accident.
It was Mr. Puryear’s opinion that the internal rule of the Public Belt that says that trains should proceed with caution within yard limits should be read as requiring the train to slow to a speed of one mile per hora-, in spite of the fact that the rule does not so state.
Mr. Puryear testified on cross-examination that at the Moonwalk crossing, when a train approached, bells and lights were activated, but he stated that he could hardly hear the bells. However, upon further cross-examination he admitted that he had submitted a claim against his railroad employer for hearing loss because of being on loud engines.
We find that it would be error to give any weight to Mr. Puryear’s testimony and any reliance thereon by the trial court was error.
1 j.fiIn its fifth assignment of error, Public Belt contends that it was error to admit the deposition of Ingrid Pueciarelli.
To put it succinctly, if it was error for the trial court to admit the deposition of Ingrid Pueciarelli, the error was harmless because the trial court in its reasons for judgment stated that it did not give the deposition “any amount of weight or credibility,” because it was inconsistent with an earlier affidavit given by her, to which the trial court also refused to accord any weight for the reciprocal reason that it conflicted with the deposition.
While the plaintiff contends that it was appropriate to admit the deposition, he contends that it was error to admit Ms. Pucciarelli’s affidavit. The plaintiff originally subpoenaed Ms. Pueciarelli, but the subpoena was directed to the wrong address on multiple occasions. Attributing the address error to a clerical mix-up, the plaintiff then argued that Ms. Pucciarelli’s deposition testimony should be admitted because she was unavailable to give live testimony. Counsel for Public Belt offered to produce video proof of Ms. Puc-ciarelli’s availability and asked for an instanter subpoena rather than permit the admission of her deposition without the ability to confront her live on the stand with her prior inconsistent affidavit. The trial court chose not to issue the instanter subpoena. Instead the trial court apparently elected to try to balance the equities by allowing the Public Belt to introduce Ms. Pucciarelli’s affidavit. The plaintiff says that this was error because he was not allowed to cross-examine the affidavit testimony of Ms. Pueciarelli. The plaintiff also raised a number of technical objections as to form.
The significance of this controversy is that the affidavit clearly states that the plaintiff “apparently attempted to climb through the slow moving train and appeared to have fallen,” facts that, if accepted, would be devastating to the | ¡^plaintiffs argument that the plaintiff was struck by the front of the train where he should have been seen in time for the train crew to take action to warn him away from the tracks. The plaintiff contends that the deposition should be read in such a way as to conclude that Ms. Pueciarelli saw the plaintiff struck by the front of the train. The deposition was taken over a year after the affidavit was given. Therefore, the affidavit, having been given at a time much closer to the time of the accident, arguably represents a fresher recollection of the accident.
Moreover, a careful reading of the deposition as a whole leads us to conclude, as did the trial court, that it is inconclusive. Ms. Pueciarelli concluded that the plaintiff must have been hit by the front of the train, but her testimony is not convincing on that point:
*547 Q. What part of the train engine did you see him get hit by.?
A. Okay. I wasn’t definite what part hit him. I just know that I thought I saw him get struck by the train.
* * *
Q. Was there anything blocking your vision from where you were to where he might have been or was?
A. Yeah. There was like a couple of trees there whereT was standing.
Later in her deposition she testified further along the same lines:
Right about where I was standing, you know, I saw somebody crossing. I thought I saw him get hit, and then I decided — I thought, well, like I said, that he probably just jumped and ran across at the last second or something, and I forgot about it for a few minutes.
Ms. Pucciarelli also testified in her deposition that the plaintiff was coming from the Decatur Street side of the tracks, attempting to cross to the river side where she and her friends were. This conflicts with the plaintiffs own version of his actions leading up to the accident. He testified that he was coming from the 1 ^riverside of the tracks and was attempting to cross over the tracks to the Decatur Street side. Other parts of her testimony were unfavorable to the plaintiffs case:
I thought it was odd that he was crossing and the train was so close to him that he could get hit. I don’t know if he realized that the train was coming or not or if he just wasn’t paying any attention or what. I just thought it was strange that he would take that risk.
She testified that the plaintiffs behavior was so bizarre after the accident that her friend asked him if he was on “some kind of drug” and he responded that “he had done some cocaine.” He was so out of it that, in spite of the fact that his leg had been severed, he tried to get up and walk around, accusing Ms. Pucciarelli of lying when she told him that his leg had been severed.' While plaintiffs counsel now argues that her testimony should be read to indicate with certainty that she was only 15 or 20 feet from the point of impact, he questioned her persistently during the deposition until she finally admitted that she could not be sure how far away she was. In any event, the plaintiff had to be closer to the train than was Ms. Pucciarelli because he was actually struck by it. Her response to the following question is adverse to the plaintiffs argument:
Q. When you first heard the train and noticed it, saw it, had it crossed St. Ann Street already, the engine?
A. I noticed it before it crossed St. Ann because you could hear it. Freight trains are loud, so you could hear it coming. [Emphasis added.] ,
Q. So it was a block or two away from you when you first heard it and when you first saw it; is that correct?
R. Yes.
This necessarily implies that if the train was loud the plaintiff should have heard it and easily avoided the accident, unless he was so drugged and intoxicated as to be the sole cause of his collision with the train as is argued by the defense.
| srMs. Pucciarelli testified in her deposition that the light on the train was not on, but this statement is contradicted by the overwhelming preponderance of the evidence including the disinterested testimony of Officer John Parker, Jr., one of two mounted officers on duty in that area at the time of the accident. This further calls into question the reliability of Ms. Pucciar-elli’s deposition testimony.
*548 Therefore, even if we were to ignore the inconsistencies between Ms. Pucciarelli’s affidavit and her deposition testimony, her deposition testimony is still so equivocal, and internally inconsistent and/or so contradicted by other more credible evidence in the record that we cannot say that it was error for the trial court to refuse to give it any weight or credibility. Moreover, the Public Belt does not contend that this Court should give any weight to Ms. Pueciarelli’s affidavit as long as none is given to her deposition. Therefore, the decision of the trial court to afford no weight to either the deposition or the affidavit was correct regardless of how that decision was arrived at procedurally.
The plaintiff filed an answer to the appeal contending that the award for general damages should be increased because of the nature of the injuries he sustained. He has problems with everyday activities such as bathing, going to the restroom, getting in and out of an automobile, visiting friends and playing sports. His chronic pain prevents him from sleeping for more than two hours at a time. He will have a lifetime of phantom pain.
The Public Belt does not respond to this argument, choosing instead to contend that the plaintiff is barred from asking for an increase in the damage award because of his failure to answer the appeal. However, the record indicates that the plaintiff filed a timely answer to the appeal on December 9, 2003, asking for an increase in the damage award.
129We find that regardless of the standard of review, the record clearly supports a finding of at least $500,000.00 in general damages (the Public Belt contests only the allocation of fault, not the amount of the general damage award), the maximum allowed under La. R.S. 13:5106 B(l), as set forth earlier in this opinion.
If the allocation of fault were based on the severity of the plaintiffs injuries and sufferings, the plaintiff would surely prevail as this Court was truly moved by the horrific nature of the plaintiffs injuries and his grim prospects for the future. However, the foregoing analysis compels us to find no fault on the part of Public Belt. Therefore, even the question of the $500,000.00 in damages remains one of academic interest only.
As the foregoing analysis is dispositive of all of the issues raised by the appeal and the answer to the appeal, it is unnecessary to consider other issues raised by the appellant.
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is herein rendered in favor of the defendant, the Public Belt Railroad, and against the plaintiff, Vernon Cooper, dismissing plaintiffs case.
REVERSED AND RENDERED.

. Id., 634 So.2d at 346.

. Emphasis added.

. 96-877 (La.App. 3 Cir. 5/7/97), 696 So.2d 1.