Dear Senator Appel:
You have requested an opinion of this office on the organization and control of the New Orleans Public Belt Railroad.
The New Orleans Public Belt Railroad ("NOPB") was established by municipal ordinance in 1904 and was recognized by Article XIV, Sections 26-28 of Louisiana's 1921 Constitution.[1] Those constitutional provisions were maintained as a statute by Article XIV, Sec. 16(A)(10) of the Louisiana Constitution of 1974. La.R.S. 33:4530-4533 are the current statutory provisions governing the railroad. *Page 2 
The NOPB is also recognized in Article V, Chapter 2 of the New Orleans Home Rule Charter as one of nine "unattached boards and commissions" of the City.[2] Because it is an unattached board of the City, the NOPB is also a political subdivision of the state as defined by La.Const. art. VI, Sec. 44(2) and La.R.S. 13:5102.[3] That the NOPB is a political subdivision of the state was most recently recognized by the Louisiana Court of Appeal for the Fourth Circuit in Cooper v. Public Belt Railroad, 2003-2116 (La.App. 4 Cir. 10/6/04), 886 So.2d 531, 537. The court stated:
We infer from the reference in Roberts to the fact that the Sewerage and Water Board was a local government unit that the Supreme Court would likewise consider the Public Belt to be a local government unit consistent with the broad definition of "political subdivision" found in La.R.S. 13:5106(B)(1), either a "municipality" or "an agency or subdivision" thereof, or "other public or governmental body of any kind. Accordingly, we find that the language of La.R.S. 13:5102(B), e.g., "municipality" or "an agency or subdivision" thereof, or "other public or governmental body of any kind," is broad enough to include a city commission such as the Pubic Belt.
Thus, the NOPB is an unattached board of the City of New Orleans and, therefore, a political subdivision of the State.
You first ask who has control over the Public Belt Railroad. Control over the NOPB is vested in the New Orleans Public Belt Railroad Commission. La.R.S. 33:4530. The Commission is composed of the Mayor of the City of New Orleans and 16 citizen taxpayers. Each member serves a 16-year term and the members are chosen in the manner and for the terms provided in Ordinance No. 2683, New Council Series, of the City of New Orleans, approved October 8, 1904. La.R.S. 33: 4530(A). La.R.S. 33:4530
sets forth the Commission's authority. It provides, in part, as follows:
A. Except as hereinafter provided in § 4531, the city of New Orleans shall continue the operation of a public belt railroad by and *Page 3 through a commission to be known as the Public Belt Railroad Commission for the city of New Orleans. . . .
B. The city of New Orleans by and through the said commission shall have the power to make contracts, acquire lands, leases and other forms of property necessary for the operation of a railroad system, either by purchase, expropriation, or otherwise, and shall have the right to operation within or without the parish of Orleans.
C. The control, operation, management and development of the public belt railroad system shall be exclusively vested in said commission, provided, however, that said public belt railroad commission shall have the power and authority subject to compliance with any applicable provisions of the charter of the city of New Orleans to contract with other firms or corporations, either public or private, or local governmental subdivisions or political subdivisions, or state agencies, for the operation, management and development of the public belt railroad system, provided that the council of the city of New Orleans shall determine that the interests of the city of New Orleans and the port of New Orleans would best be served thereby and shall approve the terms and conditions of any such contract; provided that any such contract shall recognize and maintain the rights of the employees of the public belt railroad system under existing labor contracts and applicable law.
(emphasis added). As stated above, the "control, operation, management and development" of the NOPB is "exclusively vested" in the Commission. However, if the Commission contracts with another party for the "operation, management and development of the public belt system," it would be necessary for the New Orleans City Council to determine that the interests of the City would best be served by the contract and the contract would be subject to Council approval. La.R.S. 33:4530(C).[4]
Your second question concerns the NOPB's assets. You ask who owns the assets and whether any NOPB assets may be sold or transferred to a third party. The City of New Orleans owns the assets of the Public Belt Railroad by and *Page 4 
through the Commission. The establishing ordinances of the Public Belt Railroad make it clear that it was intended that the Board of the Public Belt "acquire, own, construct, control, maintain and operate [the railroad system] . . . in the name of and for the benefit of the City of New Orleans and its citizens." City of New Orleans Ordinance No. 147, Sec. 2 (later amended by Ordinance No. 2683). See also City of New Orleans Ordinance No. 2683, which states that "the objects and purposes of the Public Belt Railroad Commission of the City of New Orleans are, and it is, therefore, hereby fully authorized and empowered, to acquire, own, locate, construct, control, maintain and operate, in the name of and for the benefit of the people of the City of New Orleans. . ." the railroad system. While the City, by and through the Commission, owns the assets of the NOPB, we note that the City created the Commission to control, operate and manage the railroad system.
With regard to the alienation of the Public Belt system, La.R.S. 33:4531
allows the sale of the public belt system as a whole upon approval of the New Orleans City Council. It provides as follows:
Upon the recommendation of the public belt railroad commission and the determination by the council of the city of New Orleans that the interests of the state of Louisiana, the city of New Orleans and the port of New Orleans would best be served if the public belt railroad system were owned and/or operated by another firm or corporation, public or private, or another political subdivision or state agency, the council of the city of New Orleans shall have, subject to compliance with any applicable provisions of the charter of the city of New Orleans, the right and authority to assign, transfer and deliver to such firm or corporation, political subdivision or state agency all of its rights of way, rails, tracks, locomotives, switch yards and such other assets of the public belt railroad system as are needed or useful in connection with the operation of a terminal railroad, upon such terms and conditions as the council of the city of New Orleans shall approve by ordinance duly adopted at a regular or special meeting of the council. Any such transfer shall require that such firm, corporation, political subdivision or state agency agree (i) to continue to operate, maintain and develop the public belt railroad system to serve the port of New Orleans and the industries located on said system; (ii) to assume and make proper and legal provision for the payment of the outstanding New Orleans Public Belt Railroad Bonds and the City of New Orleans Public Belt Railroad Bonds and the City of New Orleans Public Belt Notes; and (iii) to recognize and maintain the rights of the employees of the public belt railroad system under existing labor contracts and applicable law. With the exception of any agreement with the board of commissioners of the port of New Orleans, any such agreement with any state agency which directly or indirectly affects an *Page 5 
expenditure of state funds shall require the approval of the legislature.
As is clear from the statute above, before the ownership and operations of the public belt system (as a whole) may be transferred to another party, the Commission must first recommend the transfer and the New Orleans City Council must determine that having the public belt railroad system "owned and/or operated by another firm or corporation, public or private, or another political subdivision or state agency" would best serve the State, City, and the Port of New Orleans. Further, any transfer of entirety of the NOPB system must require the transferee to continue to operate, maintain and develop the public belt railroad system, to assume and make proper and legal provision for the payment of the outstanding NOPB bonds and notes, and recognize and maintain the rights of the employees of the public belt railroad system under existing labor contracts and applicable law.
The above cited statute is authority for the sale or transfer of the NOPB as a whole. We have found no statutory authority for the piecemeal sale of NOPB assets that are still necessary for public use. However, we do recognize that the NOPB may dispose of surplus movable property that is no longer needed for a public purpose. See City of New Orleans v.Dupuy Storage and Forwarding Corp., 41 So.2d 721 (La. 1949).
You next ask whether certain state laws, such as the public bid law and the code of governmental ethics, have any impact on the Commission. It is the policy of our office to defer to the Board of Ethics on all ethics law queries to ensure the uniform application of the Louisiana Ethics Law by the agency entrusted with its implementation. Therefore, we would defer to the Board as to whether or not the NOPB Commission members are subject to the Code of Governmental Ethics.
With regard to the public bid law, La.R.S. 38:2211, et seq., it is our opinion that said law is applicable to the Commission. The public bid law applies to public entities, which are defined by La.R.S. 38:2211(A)(11) as follows:
`Public entity' means and includes the state of Louisiana, or any agency, board, commission, department, or public corporation of the state, created by the constitution or statute or pursuant thereto, or any political subdivision of the state, including but not limited to any political subdivision as defined in Article VI Section 44 of the Constitution of Louisiana. . . .
As a political subdivision of the state, the NOPB is a public entity as defined above. Under Louisiana's public bid law, contracts for public works projects exceeding $150,000 must be advertised and let to the lowest responsible and responsive bidder. *Page 6 
The Commission is also bound by the City's competitive selection process for professional service contracts. See Exec. Order No. MJL 10-05 (June 3, 2010).
The Commission is also subject to being audited by the Louisiana Legislative Auditor's Office. La.R.S. 24:513 sets forth the powers and duties of the legislative auditor and provides, in pertinent part, that "the legislative auditor shall have authority to compile financial statements and to examine, audit, or review the books and accounts of the state treasurer, all public boards, commissions, agencies, departments, political subdivisions of the state. . . ."
The laws cited above should not be construed as an exclusive list of every law that is applicable to the NOPB.
Your fourth question asks "whether any debt security places any obligations upon or depends upon the State or the City of New Orleans." The City of New Orleans, upon the recommendation of the Commission, may issue bonds known as New Orleans Public Belt Railroad Bonds for the "development, extensions, additions, betterments and construction of the public belt railroad system . . . ." La.R.S. 33:4533(A). The City may also issue City of New Orleans Public Belt Notes. La.R.S. 33:4533(D). None of these notes may be issued except to evidence a loan of the principal amount thereof contemporaneously made to the City of New Orleans, and they may only be issued for the reasons set forth in La.R.S. 33:4533.
With respect to these bonds and notes, La.R.S. 33:4533(I) provides that they "shall be paid out of the net revenues of the Public Belt Railroad. In case of any deficiency in these revenues to pay either principal or interest in any year, then the city of New Orleans shall levy a tax on all taxable property in said City sufficient to provide for such deficiency, and the full faith and credit of the city of New Orleans shall be, and are hereby, pledged for the payment of the principal and interest of all said bonds and notes." La.R.S. 33:4533(K) also provides that "[t]he provisions hereof shall constitute a contract between the holders of any bonds and notes issued hereunder and the state of Louisiana and city of New Orleans." Thus, under these statutory provisions, if the NOPB's revenues are insufficient to meet debt service payments, the City would levy a tax to fund the deficiency. This is not to say the City must levy a tax to cover any NOPB debt, but rather, only those debts related to New Orleans Public Belt Railroad Notes or Bonds issued by the City in instances when there is a deficiency in NOPB revenues to make the debt service payments.
In addition to the revised statute which discusses NOPB bonds and notes, there is also a local ordinance on the subject. New Orleans Ordinance 2-292 provides that "[t]he city shall not become liable for any of the debts and charges of the Public Belt Railroad Commission and the property acquired by such commission, for and in the name of the city, shall not be in any manner responsible for the debts and charges of the commission. The object being to confine the payments *Page 7 
of all the expenses of the commission to the earnings of the commission." We do not find that this ordinance conflicts with the provisions of La.R.S. 33:4533 because, in the event that the NOPB's revenues are insufficient to make the debt service payments, the City would not have to use its own funds to pay the difference; rather, the City would have to levy a tax to fund the deficiency.
Related to this issue is your question as to any possible conflict between a provision of the home rule charter relating to the NOPB and a Louisiana law or constitutional provision on the same subject. Generally, when a home rule charter provision conflicts with state law, state law prevails. However, the City of New Orleans has a pre-1974 home rule charter. With respect to pre-1974 home rule charters, the La.Const. art. VI, Sec. 4 provides:
Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
Also relevant is La.Const. art. VI, Sec. 6, which provides:
The legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter.
As you can see, the powers granted to pre-1974 home rule charters are broader than those granted to home rule charters created subsequent to the adoption of the 1974 Louisiana Constitution. However, the powers of pre-1974 charters must be consistent with the Louisiana Constitution. SeeCity of New Orleans v. Board of Commissioners of the Orleans LeveeDistrict, 93-0691 (La. 7/5/94); 640 So.2d 237; Merritt McDonaldConstruction, Inc. v. Parish of East Baton Rouge, 98-1032 (La.App. 1 Cir. 5/14/99); 742 So.2d 564. As these cases also note, a conflicting state law is not preemptive unless it is "necessary to protect the vital interest of the state as a whole." City of New Orleans, 640 So.2d at 252;Merritt McDonald Construction, 742 So.2d at 570; See also La. Atty. Gen. Op. No. 92-764, which discussed the conflict between a charter provision relating to the selection of NOPB Commission members and La.R.S. 33:4530. The City may amend its Charter provisions as they relate to the NOPB but the question of whether any amendments would be preempted would have to be considered in light of the above. *Page 8 
Your next question asks whether the City (or anyone) would have a claim to any excess revenue in the event that the Commission's revenue exceeded its expenses. Because the NOPB is a political subdivision as defined by La.Const. art. VI, Sec. 44, it is entitled to spend its excess revenues in accordance with La.R.S. 33:2922(A) provides as follows:
The annual revenues of any political subdivision (which term shall mean those units of local government listed in Subsection 2 of Section 44 of Article VI of the Louisiana Constitution of 1974) shall be dedicated as follows: first, all statutory charges shall be paid from the respective funds upon which they are imposed; second, all charges for services rendered annually under time contracts; third, all necessary and usual charges provided for by ordinance or resolution. Any excess of revenue above such statutory, necessary and usual charges may be applied to the payments of amounts due and unpaid out of the revenues of former years. Any parish, municipal corporation, and any other political subdivision having the prior approval of the governing authority which created it may make in any year, contracts or other obligations dedicating in whole or in part the excess of annual revenues of subsequent years above such statutory, necessary and usual charges. No such contract or obligation shall have any longer term fixed for payment than ten years from the date of the contract or obligation. No dedication of future revenues shall be made which, alone or with other prior dedications in force, exceeds the estimated excess of revenues over the statutory, necessary and usual charges of the year in which the contract or obligation is made. This Section shall not be construed to prohibit any political subdivision from providing by ordinance or resolution for the expenditure of funds derived from miscellaneous or contingent sources actually collected, subject to the dedication of such funds established by law.
Pursuant to this statute, the NOPB is authorized to spend its revenue remaining after its statutory, necessary and usual charges have been met to satisfy or make payments of amounts due and unpaid out of the revenues of former years. Under this statutory regime and considering the Constitutional limitations on the use of the public funds and assets of political subdivisions found at La.Const Art. VII, Sec. 14, we are of the opinion that the NOPB revenues may only be used by the NOPB Commission for purposes benefitting the NOPB, including expenditures for the operations of the NOPB railroad; the acquisition of assets, etc., for the operation of the NOPB railroad system; and the payment of the debts of the NOPB, as discussed above. Our reading of the governing laws leads this office to the conclusion that neither the City of New Orleans, nor any other public entity, has any "claim" or right to any "surplus" revenue that may accrue to the NOPB over the course of its continuing operations. *Page 9 
Finally, you ask whether the City or State may impose any taxes upon the NOPB, its property, income, or assets. The NOPB is exempt from paying certain taxes based on the following constitutional and statutory provisions. First, La.Const. art. VII, Sec. 21(A) exempts from ad valorem taxation "public lands; other public property used for public purposes." The NOPB's assets are public property. To the extent they are used for public purposes, they would be exempt from ad valorem taxation. Next, La.R.S. 47:301(8)(c) provides that "for purposes of state and use tax levied by the state and any political subdivision, `person' shall not include any political subdivision, or any agency, board, commission, or instrumentality of this state or its political subdivisions." As a governmental entity, the NOPB is exempt from state income taxation.
Thus, the state or the City cannot impose taxes on the NOPB or its assets without first amending the exemptions outlined above. We would recommend the NOPB seek a private letter ruling from the Louisiana Department of Revenue if it has questions as to which taxes it must pay and/or is exempt from.
We trust this adequately responds to your request. However, if our office can be of further assistance, please do not hesitate to contact us.
Yours very truly,
JAMES D. "BUDDY" CALDWELL Attorney General
By:_________________
Lindsey K. Hunter Assistant Attorney General
JDC/LKH/chb
[1] The pertinent part of Art. XIV, Sec. 26 of the Constitution of 1921 provides: "[i]t shall be the duty of the City of New Orleans to continue the operation of a Public Belt Railroad by and through a commission to be known as the Public Belt Railroad Commission for the City of New Orleans. * * * The control, operation, management and development of the Public Belt Railroad system shall be exclusively vested in said commission, which shall always be separate and distinct from that of any railroad. * * * Said Public Belt Railroad system shall be and remain the sole property of the people of the City of New Orleans at all times, and shall in no way or manner ever be hypothecated or alienated."
[2] The Fourth Circuit has defined `unattached' boards and commissions as those that "are not attached to specific departments under the executive branch." Save Our Parkways, Inc. v New Orleans, 357 So.2d 57, 58
(La. App. 4 Cit. 1978).
[3] La.Const. art. VI, Sec. 44(2) defines `political subdivision' as a "parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions." La.R.S. 13:5102(B)(1) defines `political subdivision' as "[a]ny parish, municipality, special district, school board, sheriff, public board, institution, department, commission, district, corporation, agency, authority, or an agency or subdivision of any of these, and other public or governmental body of any kind which is not a state agency."
[4] Although the Commission has statutory authority to control, operate, manage and develop the Public Belt, this in no way limits the City Council's authority to enact ordinances that affect the NOPB insofar as they regulate the general public safety and welfare. See Sambola v.Public Belt R.R. Com'n of City of New Orleans, 56 So. 2d 267 (Orl. App. 1952), which held that the provision of law stating "control, operation, management and development of public belt railroad system was to be exclusively vested in public belt railroad commission meant that city council was not nor was any other railroad or officer thereof to interfere with operation, control, management and development of public belt railroad, but did not attempt to limit, restrict, or nullify application of ordinances enacted in behalf of general public safety and welfare by City of New Orleans to public belt railroad."