McCLENDON, J.
In this personal injury suit, the plaintiff appeals a trial court judgment that found the jury's award for future earning capacity subject to the State's limitation for general damages. For the following reasons, we affirm.
RELEVANT FACTS AND PROCEDURAL HISTORY
Eighteen-year old Jacobee Lee, the plaintiff in this matter, graduated from high school in Shreveport in 2009 and accepted a full basketball scholarship to Grambling State University (GSU) beginning in the fall semester of 2009. On August 14, 2009, Jacobee suffered an exertional heatstroke following a mandatory four-mile outdoor disciplinary run called the Tiger Mix around the campus at GSU.[1] The Tiger Mix was part of an unauthorized basketball team practice at the university. After completing the run, Jacobee made it back to the gym, but shortly thereafter lost consciousness. He was hospitalized for two days, after which he was discharged with diagnoses of heat exhaustion and mild rhabdomyolysis, which is the breaking down of skeletal muscle that can be caused by extreme physical activity.[2] Since the Tiger Mix, Jacobee has suffered elevated creatine phosphokinase (CPK) levels and has been diagnosed with depression, anxiety, and post-traumatic stress disorder (PTSD).[3]
On August 6, 2010, Jacobee filed a Petition for Damages against the Board of Supervisors for the University of Louisiana System and GSU (collectively Grambling) for the personal injuries he suffered as a result of the run.[4] On March 23, 2016, following a seven-day trial, the jury found Grambling at fault for Jacobee's injuries *289 and awarded him $ 2,529,229.00 in damages, as follows:
Past and Future Physical Pain and Suffering $ 200,000.00 Past and Future Mental Pain and Suffering $1,000,000.00 Past Medical Expenses $ 15,229.00 Future Medical Expenses $ 24,000.00 Past Lost Wages $ 90,000.00 Loss of Earning Capacity $ 600,000.00 Loss of Enjoyment of Life $ 600,000.00 _____________ Total $2,529,229.00
Jacobee filed a proposed judgment on April 1, 2016.[5] On April 4, 2016, Grambling submitted its own proposed judgment. The matters were heard by the trial court and taken under advisement. Thereafter, on September 16, 2016, the trial court issued its ruling, finding that the judgment was subject to the State's $ 500,000.00 limitation on general damages. Specifically, the trial court found that past and future physical and mental pain and suffering, loss of earning capacity, and loss of enjoyment of life were all collectively subject to the State's $ 500,000.00 cap on general damages. The trial court signed a judgment on February 13, 2017, awarding Jacobee past and future physical and mental pain and suffering, loss of earning capacity and loss of enjoyment of life in the amount of $ 500,000.00; awarding past medical expenses in the amount of $ 15,229.00; awarding past lost wages in the amount of $ 90,000.00; capping future medical expenses at $ 24,000.00, payable through the Future Medical Care Fund; and awarding expert cost and deposition cost in the amount of $ 29,998.50, in addition to all costs of court and legal interest, for a total amount of $ 659,227.50.
Jacobee has appealed the trial court's judgment. In his sole assignment of error in this appeal, Jacobee asserts that the trial court erred in vacating the jury's future economic losses award as being subject to the State's cap on damages.
DISCUSSION
The Louisiana Governmental Claims Act, LSA-R.S. 13:5101 et seq. , was adopted in 1975 pursuant to an amendment to the Louisiana Constitution giving constitutional status to the proscription against sovereign immunity from substantive tort liability. Fecke v. Board of Supervisors of Louisiana State University , 15-1806 (La. 9/23/16), 217 So.3d 237, 244. See also LSA-Const. art. XII, § 10. The Act establishes procedural rules that apply to any suit in contract or for injury to person or property against the state, a state agency, or a political subdivision of the state. LSA-R.S. 13:5101[6] ; Fecke , 217 So.3d at 244. The *290 Act limits general damages for personal injury or wrongful death to $ 500,000.00, exclusive of property damages, medical care and related benefits, loss of earnings, and loss of future earnings.[7] LSA-R.S. 13:5106B.
Louisiana Revised Statutes 13:5106B(1) provides:
The total liability of the state and political subdivisions for all damages for personal injury to any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the personal injury to that person.
Additionally, LSA-R.S. 13:5106C(1) provides:
C. If the state or a state agency or political subdivision is held liable for damages for personal injury or wrongful death, the court shall determine:
(1) The amount of general damages exclusive of:
(a) Medical care.
(b) Related benefits.
(c) Loss of earnings and/or support.
(d) Loss of future earnings and/or support.
Louisiana Revised Statutes 13:5106D(2) defines "loss of future earnings" as "any form of economic loss which the claimant will sustain after the trial as a result of the injury or death which forms the basis of the claim." It is undisputed that both the Board of Supervisors for the University of Louisiana System and GSU are constitutional and statutory agencies of the State of Louisiana.
In his appeal, Jacobee argues that the jury's award for loss of earning capacity is not subject to the State's damages cap, asserting that he sufficiently proved at trial the pecuniary loss he suffered. Specifically, he maintains that the award was for non-speculative future economic losses and is therefore excluded from the $ 500,000.00 statutory cap. To the contrary, Grambling contends that the trial court properly limited the jury award, arguing that the jury's award for "Loss of Earning Capacity" was a general damages award subject to the cap. It argues that Jacobee failed to show with reasonable certainty that the damages awarded were economic losses and not speculative conjecture. Thus, the narrow issue for review is whether, under the particular facts of this case, the trial court correctly determined *291 that the jury's award for "Loss of Earning Capacity" was not an award for "loss of future earnings" as defined in LSA-R.S. 13:5106, and therefore subject to the State's limitation on general damages.
The fourth circuit has addressed this issue in Cooper v. Public Belt R.R. , 03-2116 (La.App. 4 Cir. 10/6/04), 886 So.2d 531, writ denied, 04-2748 (La. 1/28/05), 893 So.2d 75. In Cooper , the court initially noted the difference between "loss of future earnings" and "loss of earning capacity," citing the supreme court case of Folse v. Fakouri , 371 So.2d 1120 (1979). The fourth circuit stated that the supreme court in Folse drew a distinction between a "pecuniary loss" and "loss of earning capacity."[8] Cooper , 886 So.2d at 539. As a result, the Cooper court found that the term "pecuniary loss" as used in Folse was synonymous with "economic loss" as employed in LSA-R.S. 13:5106D(2). Cooper , 886 So.2d at 539. The court then concluded:
By noting that proof of loss of future earning capacity does not require proof of future monetary loss, the Folse opinion reinforces the conclusion of this Court that loss of future earning capacity is not an "economic loss" within the intendment of [LSA-]R.S. 13:5106D(2).
* * *
[I]n addition to the establishment of the $ 500,000.00 limitation subject to the exclusions set forth in [LSA-]R.S. 13:5106B(1), the manner in which those exclusions are specifically referenced again in [LSA-]R.S. 13:5106C(1) emphasizes the legislative consciousness of the specific nature of the enumerated exclusions and concomitantly serves to support the conclusion that the legislature by creating such a specific list did not intend to include items of damage customarily considered separately, such as loss of earning capacity.
Cooper , 886 So.2d at 539. The Cooper court, in finding that "loss of earning capacity" was properly contained within general damages, also stated that because the items excluded from the limitation are "exceptions," they should be strictly construed consistent with the general rules of statutory construction and that this was especially true where the strict construction of the exceptions advanced the public policy expressed in LSA-R.S. 13:5106E of protecting the public health, safety and welfare from the excessive depredations of judgments against public entities.[9] Cooper , 886 So.2d at 539.
*292 Thereafter, in Iles v. Ogden , 09-0820 (La.App. 4 Cir. 2/26/10), 37 So.3d 427, writs denied, 10-0863, 10-0986 (La. 9/3/10), 44 So.3d 694, 695, the fourth circuit considered whether a claim for loss of the value of an inheritance was included in LSA-R.S. 13:5106C(1)(d), "loss of future support." Iles , 37 So.3d at 444. The Iles court agreed with the result in Cooper with regard to the "loss of earning capacity," and noted that the Cooper case did not involve LSA-C.C. arts 1607 and 1608, which were at issue in Iles . However, with regard to the claim for a lost inheritance, the court in Iles concluded that if a claim was properly supported by the record, that is, if the evidence is not speculative and is capable of mathematical calculation, then the loss is a specific damage and not a general damage. Id. In Iles , under the unique and specific facts of that case, the loss of the value of the inheritance could readily be determined from the record, and the precise value of the plaintiff's loss was not speculative, but was ascertainable and essentially a sum certain. Id.
In Menard v. Cox Communications Louisiana, Inc. , 15-1628 (La.App. 1 Cir. 8/31/16) (unpublished) (2016 WL 4586027), writ denied, 16-1902 (La. 12/5/16), 210 So.3d 813, this circuit also recognized the distinction between an award for loss of future earnings and an award for loss of earning capacity in the context of LSA-R.S. 13:5106. We stated that because loss of future earning capacity, unlike loss of future wages, is not necessarily determined by actual loss, Louisiana courts have held that damages for loss of future earning capacity are not "economic losses" and remain subject to the $ 500,000.00 statutory cap on damages under LSA-R.S. 13:5106B(1), and, conversely, damages for loss of future earnings are excluded from the statutory cap on damages. Menard, 15-1628 at p. 7.
In Menard , the plaintiff was employed as a legal secretary prior to her accident. Ms. Menard's vocational rehabilitation expert testified at trial that the accident severely limited Ms. Menard's employability and earnings. Based upon the vocational rehabilitation expert's opinion and Ms. Menard's documented earnings, her economist calculated what Ms. Menard would suffer in future lost wages. Following the submission of evidence, the trial court instructed the jury on the law applicable to loss of future income and submitted a verdict form to the jury that listed future loss of wages as a compensable item of damages. There was no objection to the jury instructions or the jury verdict form concerning the itemization of compensable damages. Accordingly, this court found no error in the jury's award of damages for future loss of wages based on the evidence introduced at trial, which was excluded from the statutory cap under LSA-R.S. 13:5106B(1).[10] Id.
Shortly thereafter, the supreme court decided the Fecke case. In Fecke , the plaintiff was unemployed at the time of an injury to her ankle, although she was just two weeks from graduating with her Bachelor of Science in Kinesiology. Thereafter, she returned to school to obtain a certification as a physical therapist assistant. She began working as a physical therapy assistant, but the job entailed long hours of standing, walking and weight-bearing activity, *293 all of which proved difficult with her injured ankle. As a result, by the time of trial, plaintiff had already changed employment to a less demanding physical therapy assistant position with fewer hours and less pay. At trial, the Feckes' expert vocational rehabilitation consultant and life care planner testified with specificity regarding plaintiff's education, work history, current earnings and future vocational prospects, in light of her physical limitations which would affect her future earnings. Also, the Feckes' expert in the projection of economic losses, Harold Asher, reviewed the vocational rehabilitation consultant's report regarding future life care and calculated plaintiff's economic outlook, including loss of future earnings.[11] Fecke , 217 So.3d at 253.
The supreme court concluded that the expert testimony and reports of the two witnesses established that the plaintiff's future loss of earnings was pecuniary in nature, rather than speculative and uncertain. Accordingly, the Fecke court determined that the jury instruction and verdict form citing "loss of future earnings" were proper and not an abuse of the trial court's discretion. Id.
With this framework in mind, we now turn to the case before us. At trial, Jacobee testified that he made the varsity basketball team at the end of his sophomore year at Huntington High School. Jacobee stated that he was an average student, but was hoping for a basketball scholarship in college. He testified that he signed with GSU early in his senior year to play basketball and that he attended two sessions of summer school at both Southern University in Shreveport (SUSLA) and GSU in the summer of 2009 in order to raise his grade point average (GPA) to be eligible to play basketball. Jacobee made a 3.0 GPA in both sessions. Jacobee testified that he chose Grambling University because it was a family school, stating that his grandfather, aunts, and uncle went there, and that Grambling promised to help him academically, with study halls and tutoring. He also stated that his mother is a college graduate, as are his grandmother and several members of his family.
After the Tiger Mix, Jacobee did not rejoin the team, struggled academically, and eventually withdrew from the university at Christmas. Jacobee enrolled at SUSLA for the spring 2010 semester. One weekend in February of 2010, Jacobee played in a basketball tournament. A few days later, Jacobee was admitted to the hospital with fever, a skin disorder, and a urinary tract infection. Jacobee had a CPK level of 7955. After being in the hospital for one week, Jacobee withdrew from SUSLA citing medical reasons. He reenrolled and attended SUSLA in the fall of 2010 and the spring of 2011. Jacobee then left SUSLA and enrolled at Stephen F. Austin State University in Nacogdoches, Texas, but did not do well there and withdrew from school. At that time, Jacobee had earned fifty hours towards a college degree with an overall GPA of 2.58. Subsequently, Jacobee began working and has not returned to college. At the time of trial, Jacobee was working selling phones and phone plans, making minimum wage.
While in the hospital in February of 2010, Dr. Robert Goodman, a rheumatologist, was called in to try to determine the cause of Jacobee's elevated CPK level. According to Dr. Goodman, Jacobee experienced a second episode of rhabdomyolisis after playing basketball in February of 2010. It was his opinion that, because of the Tiger Mix, Jacobee would no longer be likely to play college or professional basketball and that Jacobee's other future job *294 opportunities were limited as well, stating that employment such as heavy manual labor or the military were no longer viable options.
Todd S. Capielano, Jacobee's vocational rehabilitation consultant, testified that, until the Tiger Mix, Jacobee's actions were more and more in line with his dream to play basketball. Mr. Capielano testified that basketball was Jacobee's focus, which kept him motivated to get his degree. Mr. Capielano stated that while Jacobee was not a star student, he was motivated and had potential. Jacobee needed structure, and with academic support systems in place, Mr. Capielano believed that Jacobee would have graduated from college. Mr. Capielono testified that this was taken away from him because of the Tiger Mix. Mr. Capielano stated that, after the Tiger Mix, Jacobee was going to be limited to entry level lower skill to semi-skill types of employment, like a call center operator or a customer service representative, which matched Jacobee's interests and were in line with the results of his testing. Further, a military career, which Jacobee had expressed an interest in, was no longer possible because of the physical exertion requirements.
Harold Asher, a certified public accountant and Jacobee's expert in the field of damage calculation and economic losses, formed an opinion regarding Jacobee's loss of economic capacity. Mr. Asher provided three different employment scenarios. The first scenario was where Jacobee graduated with a bachelor's degree and started to work. According to Mr. Capielano, Jacobee's average earnings over his work life would be $ 54,000.00 a year compared to jobs of $ 25,743.00 per year average, which was what he was currently able to make. The second scenario was where Jacobee graduated and played professional basketball internationally for ten years. Although salaries varied widely, between $ 15,000.00 and $ 500,000.00 per year, Mr. Asher used a salary at the lower end of $ 40,000.00 per year. After ten years, Jacobee would then become a college basketball coach. Mr. Asher testified that basketball coaches and assistants make between $ 80,000.00 and $ 400,000.00 a year. As an assistant coach, Mr. Asher used the amount of $ 80,000.00 per year for Jacobee. The third scenario involved a situation where Jacobee actually had a skill set that would have allowed him to go from the low end of $ 15,000.00 internationally per year to $ 450,000.00 a year at the end of his tenth year. Under that scenario, Jacobee would then retire and become a college assistant basketball coach starting at $ 80,000.00 and ending at $ 120,000.00 per year. Under the first scenario, Mr. Asher calculated a loss of $ 1,406,404.00. The middle scenario resulted in a loss of about $ 2.4 million dollars, and under the third scenario, Mr. Asher calculated a $ 5,489,162.00 loss.
Grambling's own forensic economic expert, Dr. Robert Hebert, testified at trial. Dr. Hebert first critiqued Mr. Asher's report, finding it exaggerated, and made his own calculations. The calculations were based on two alternatives, that is, a non-sports-related career path and a sports-related career path. Dr. Hebert compared both Mr. Capielano's calculations and those of Gramblings's vocational rehabilitation expert, Sandra Kreuter, which he included in his report in summary tables. According to Dr. Hebert, if, but for the events of August 14, 2009, Jacobee would have earned the average wage income of a black male with a bachelor's degree, the discounted present value of his potential lost earning capacity was between $ 367,804.00 (based on Ms. Kreuter's assessment) and $ 661,525.00 (based on Mr. Capielano's assessment). Also, in the non-sports-career path, if, but for the Tiger *295 Mix, Jacobee would have earned the average wage income of an entry-level computer specialist with some college but no degree, the discounted present value of his future potential lost earning capacity was between zero (Ms. Kreuter) and $ 629,101.00 (Mr. Capielano).[12] Further, on the sports-career path, if, but for the Tiger Mix, Jacobee had pursued a professional basketball career through a player development league with subsequent employment as a coach or scout, the discounted present value of his potential lost earning capacity was between zero (Ms. Kreuter) and $ 269,357.00 (Mr. Capielano).
After the submission of evidence, the trial court instructed the jury on the law, including the law applicable to loss of future earning capacity. The trial court did not instruct the jury on the law applicable to loss of future earnings, nor did the jury verdict form include future lost wages.[13] Grambling did not object to the jury instructions or to the jury verdict form listing "Loss of Earning Capacity" as an item of damages. Accordingly, the jury awarded Jacobee $ 600,000.00 in damages for his loss of earning capacity.
Based on the evidence presented, we are unable to say that Jacobee proved that he suffered a loss of future earnings. The present case is unlike the Fecke case wherein the plaintiff was pursuing her career as a physical therapist assistant. Ms. Fecke did graduate and returned to school to obtain a certification as a physical therapist assistant, after which she began working as a physical therapy assistant. However, because of her injury, Ms. Fecke was required to change employment to a less demanding physical therapy assistant position with fewer hours and less pay. Ms. Fecke was already in a certain career or profession, but she could not continue in that job because of her injury. The evidence presented, including detailed evidence of her education, work history, current earnings, and future vocational prospects, was very specific and established with reasonable certainty her loss of future earnings. Similarly, in Menard , Ms. Menard had been employed as a legal secretary and presented evidence of her earnings. Ms. Menard's economic expert was able to calculate future lost wages based on the documented evidence.[14]
In comparison, Jacobee had just begun college when he was injured. He was at least four years from a college bachelor's degree. It was uncertain whether he would have graduated from college. His career or professional path had not yet been decided. Mr. Asher, Jacobee's own expert in damage calculation, testified that his calculations were based on Jacobee's loss of *296 economic capacity.[15] What Jacobee suffered was a loss of his potential, or earning capacity, rather than a loss of future earnings. The jury's award of $ 600,000.00 in damages was estimated on his potential to earn money in the future and was not an award for "economic loss" that he would sustain in the future. Accordingly, it is a general damage award and subject to the State's $ 500,000.00 liability cap, pursuant to LSA-R.S. 13:5106B(1). Because the jury's award was a larger amount than Jacobee was statutorily entitled to receive, the trial court appropriately corrected the jury's award for general damages. Therefore, we find that the trial court correctly held that the jury's award for "Loss of Earning Capacity" was subject to the State's limitation on general damages.
CONCLUSION
For the above reasons, the February 13, 2017 judgment of the trial court is affirmed. All costs of this appeal are assessed to the plaintiff, Jacobee Lee.
AFFIRMED.
Welch, J. dissents & assigns reasons.
WELCH, J., dissents.
I respectfully disagree with the majority opinion because it erroneously affirms the trial court's determination that the jury's award of $ 600,000 for the plaintiff's loss of earning capacity was subject to the State's $ 500,000 limitation on liability for general damages. The majority opinion is clearly contrary to the Louisiana Supreme Court's ruling in Fecke v. Board of Supervisors of Louisiana State University , 2015-1806 (La. 9/23/16), 217 So.3d 237, which notably, was decided one week after the trial court issued its ruling herein that the plaintiff's loss of earning capacity was subject to the state's cap on general damages.
Fecke unequivocally held that if future economic losses are proven with expert testimony, such evidence is sufficient to establish that such loses are pecuniary in nature, rather than speculative and uncertain, and as such, are not subject to the State's damage cap. Furthermore, Fecke does not allow the trial court to decide, after the fact, whether the expert testimony with regard to future economic losses is sufficiently credible for the jury's award to be pecuniary or speculative. Herein, the plaintiff offered expert testimony-as did Grambling-as to the plaintiff's future economic losses and that testimony established that his future loss of earning was pecuniary in nature; thus, it was not subject to the state's damage cap.
Furthermore, the majority opinion is also inconsistent with the manner in which the loss of earning capacity award was handled in the case involving Jacobee's teammate, Henry White, who likewise suffered a heatstroke and died as a result of the Tiger Mix. See Williams v. Board of Supervisors of the University of Louisiana System , 48,763 (La. App. 2nd Cir. 2/26/14), 135 So.3d 804 (wherein the jury's award of $ 780,000 for Henry White's loss of earning capacity was apparently not subject to the state's cap on general damages, as judgment was rendered in the plaintiff's favor for the sum of $ 1,595,771.00).
Accordingly, I would amend the judgment of the trial court to include, in accordance with the jury's verdict, an additional award of $ 600,000 for the plaintiff's loss of earning capacity, which would provide *297 for a judgment in the total amount of $ 1,259,227.50.
Thus, I respectfully dissent.

For a more complete recitation of the facts, see Lee v. Louisiana Board of Trustees for State Colleges , 2017 CA 1433, --- So.3d ----, 2019 WL 1198551, also decided this date.

The medical evidence shows that Jacobee suffered a heatstroke rather than heat exhaustion.

CPKs are muscle enzymes. The level of these muscle enzymes rise as the muscle is destroyed. When Jacobee was admitted to the hospital after the Tiger Mix, his CPK level was 651. A normal CPK level is between 35 and the low 200s.

In Mr. Lee's petition, the Board of Supervisors for the University of Louisiana System was incorrectly identified as the Louisiana Board of Trustees for State Colleges.

On April 4, 2016, Jacobee also filed a Motion for Judgment on Offer of Judgment and to Tax Costs. On September 16, 2016, the trial court denied Jacobee's motion for judgment on offer of judgment and ruled on the motion to tax costs. The trial court signed that judgment on February 13, 2017. The denial of the motion for judgment on the offer of judgment is the subject of the related case of Lee v. Louisiana Board of Trustees for State Colleges , 2017 CA 1432, 275 So.3d 15, 2019 WL 1198390, also decided this date.

Louisiana Revised Statutes 13:5101 provides:
A. This Part shall be known and may be cited as the "Louisiana Governmental Claims Act".
B. This Part applies to any suit in contract or for injury to person or property against the state, a state agency, an officer or employee of the state or a state agency arising out of the discharge of his official duties or within the course and scope of his employment, or a political subdivision of the state, as defined herein, or against an officer or employee of a political subdivision arising out of the discharge of his official duties or within the course and scope of his employment. The provisions of this Part shall not supersede the provisions of R.S. 15:1171 et seq. or R.S. 15:1181 et seq.

After the supreme court declared LSA-R.S. 13:5106 unconstitutional in 1993, holding that the $ 500,000.00 cap on general damages in a personal injury suit against the State contravened the proscription against sovereign immunity from tort liability provided for in LSA-Const. art. XII, § 10 (A), the legislature proposed a constitutional amendment to the article, which was approved by the voters in 1995. Also in 1995, the legislature increased the maximum liability of the State for general damages in wrongful death cases at $ 750,000.00. Fecke , 217 So.3d at 244-45. Thereafter, in an effort at tort reform, the legislature in 1996 amended LSA-R.S. 13:5106B to limit general damages in suits against the state, a state agency, or political subdivision for personal injury or wrongful death to $ 500,000.00. Id.

The Folse court stated:
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Folse , 371 So.2d at 1124.

Louisiana Revised Statutes 13:5106E provides:
E. The legislature finds and states:
(1) That judgments against public entities have exceeded ability to pay on current basis.
(2) That the public fisc is threatened by these judgments to the extent that the general health, safety, and welfare of the citizenry may be threatened.
(3) That the limitations set forth in this Section are needed to curb the trend of governmental liability abuses, to balance an individual's claim against the needs of the public interests and the common good of the whole society, and to avoid overburdening Louisiana's economy and its taxpaying citizens with even more new and/or increased taxes than are already needed for essential programs.
(4) That the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the constitution.

Although the Menard case was decided before the supreme court's decision in Fecke , we find instructive its discussion therein regarding loss of future earnings and loss of earning capacity in the context of LSA-R.S. 13:5106.

We note that Mr. Asher is also Jacobee's expert economist in this matter.

Testimony at trial indicated, however, that even before the Tiger Mix Jacobee was not very strong in math and science and, although he expressed an interest in computer science, a career in that field did not seem likely.

The trial court's closing instructions included the following:
Loss of earning capacity damages are damages for the plaintiff's ability to earn money in the future and not what he actually earned before the injury. When determining loss of earning capacity, the damages are estimated on the injured person's ability to earn money in the future. It must be proved by a preponderance of the evidence and it requires the presentation of medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the injury. It is not a loss of earnings, but rather a loss of future earning capacity. You should consider whether and how much his current condition disadvantages him in the work force.

We note that in both Fecke and Menard , the jury instructions and jury verdict form were regarding future lost wages as opposed to loss of earning capacity.

Additionally, in response to interrogatories in which Grambling requested that Jacobee itemize the damages he sustained, Jacobee responded, in his supplemental answer, that he suffered a loss of earning capacity.